H. W. ROGERS & BROTHER v. JOHN T. MARRIOTT.

FILED MARCH 7, 1900. No. 9,140.

1. **Wagering Contract: PUBLIC POLICY: BONA FIDES.** In a transaction,
   involving the alleged purchase of wheat upon the Chicago board
   of trade, which is challenged as a wagering contract and void
   as being contrary to public policy, the true test is whether there
   was in the minds of the parties to the transaction an intention
   in good faith to purchase the property, and to secure a *bona fide*
   transfer and actual delivery thereof to the purchaser.

2. **Valid Contract: POSSESSION OF SELLER: FUTURE DELIVERY.** A valid
   contract for the future delivery of wheat, even though not in
   the possession of the seller, may be entered into, and such con-
   tract would be upon the same plane as any other legal obliga-
   tion for the sale and delivery of any species of personal prop-
   erty.

3. ———: **GOOD FAITH OF ONE PARTY: GENUINE TRANSFER.** Where
   such a contract is entered into by one of the parties thereto
   in good faith, the same would be valid and binding, even though
   the other party to the contract entered into it with no inten-
   tion to effect a genuine transfer of the property, and merely
   as a gambling transaction and speculative venture on the fluc-
   tuation in the price of the commodity nominally dealt in.

4. **Controversy between Principal and Agent: GAMBLING PURCHASES.**
   In a controversy between a principal and his agents, acting as

commission merchants or brokers, in a transaction involving an alleged purchase of grain for future delivery, the question is whether the intention was that the principal should become the actual buyer of grain through the agency of the commission merchants, or whether they expressly or impliedly agreed to act as the principal's agent in gambling purchases of grain, which the principal had no intention of receiving.

5. **Bad Faith of Principal.** If the transaction was a gambling one on the principal's part, and known to be such by those acting for him, and the services and advances which constitute the cause of action were made and rendered in carrying it into effect, the agent can not recover therefor.

6. **Agreement in Testimony: BUT ONE CONCLUSION.** Where the evidence in the case is neither conflicting nor contradictory, and it is not of such a nature as to warrant different conclusions by reasonable men, and but one rational conclusion can be drawn therefrom, it becomes proper for a trial judge to treat the case as having been resolved into questions of law, and to suitably instruct the jury acccordingly.

7. **Evidence Examined.** Evidence examined, and *held* that the only conclusion to be reached from the plaintiff's evidence is that the contract was based on a wagering transaction, 'and that there was, in fact, no intention on the part of the parties to engage in a *bona fide* purchase to be followed by an actual delivery of the commodity in which they nominally dealt, and that such transaction was a gambling venture and speculation in the fluctuation in the price of wheat in the markets, and is void as being contrary to public policy.

ERROR from the district court of Dixon county. Tried below before EVANS, J. *Affirmed.*

*O. E. Martin,* for plaintiff in error:

Was the evidence sufficient to make a *prima facie* case in favor of the plaintiffs on the issues joined? The board of trade of Chicago was a voluntary corporation, organized under state charter, its members being business men interested in handling grain and provisions. The members handled ninety-nine per cent of the grain that came to the Chicago market. Among the purposes and objects of the board of trade were the following: To establish values for commercial articles therein dealt in, and to find and distribute commercial information and to secure

for its members benefits by co-operation in their pursuit of the grain business. See deposition, p. 22. There prevails among the members of the board of trade a universal custom with regard to the putting up of margins in the hands of commission merchants by non-members of the board, who buy or sell property through members of the board. The custom is well known and absolute. Everybody is expected to put up a margin, which consists of a certain amount of money to protect a contract to the extent of the money deposited as such margin against a rise or fall in the market. See deposition, 19. Persons who dealt in a market were presumed to know of and deal with reference to the customs of the market. See *Bailey v. Bensley*, 87 Ill., 556, and authorities cited on p. 559; *Cothran v. Ellis*, 107 Ill., 413.

Contracts made in good faith for the future delivery of grain or other commodity, at some time in the future, were not prohibited either by the common law or the statute. See *Wolcott v. Heath*, 78 Ill., 433; *Pixley v. Boynton*, 79 Ill., 351; *Logan v. Musick*, 81 Ill., 415. In the last case cited the examination showed, as the correspondence showed in this case, that actual grain was purchased and it showed it no more conclusively than was the fact shown in the case at bar. To the same effect was *Irwin v. Williar*, 110 U. S., 499, in which numerous cases were cited from the leading states of our Union. They were all to the same effect, that contracts for the purchase or sale of grain or other commodities to be delivered in the future, if *bona fide*, were valid and would be enforced by the courts.

When the defendant failed to put up margins in accordance with the custom of the board of trade, as repeatedly promised by him, the plaintiffs had the right, under the rules of the board of trade, to sell the grain purchased for the defendant, at the market price, and hold the defendant for the loss. See *Moeller v. McLagan*, 60 Ill., 317.

° *John B. Barnes, M. D. Tyler* and *Alfred E. Barnes,* contra:

Throughout the whole history of the pretended transactions no money was ever demanded for anything except as margins. There was no pretense of demanding it for anything else. No grain was transferred. No warehouse receipt for any grain was ever given or received by any one. In fact the whole transaction was conclusively shown to be a speculation on the rise and fall of the price of wheat on the board of trade. This was, therefore, a gambling contract and void as against public policy. See *Sprague v. Warren,* 26 Nebr., 326; *Walte v. Wickersham,* 27 Nebr., 457; *First Nat. Bank v. Oskaloosa Packing Co.,* 23 N. W. Rep. [Ia.], 255; *Gregory v. Wattowa,* 58 Ia., 711; *Murray v. Ocheltree,* 59 Ia., 435; *Pixley v. Boynton,* 79 Ill., 351; *Logan v. Musick,* 81 Ill., 415; *Corbett v. Underwood,* 83 Ill., 324; *Bigelow v. Benedict,* 70 N. Y., 202.

The plaintiff's own evidence brought this case clearly within the rule established in the above cases, and the judgment must be affirmed. The cases cited by counsel for the plaintiff were not in point. An examination of them showed that there was in all of them an actual sale of grain, actually existing and stored in warehouses, for which warehouse receipts were given and accepted.

HOLCOMB, J.

As ground for recovery the plaintiffs in their petition state, in substance, that the defendant is indebted to them in the sum of $1,446.25 on account of the purchase at the request of the defendant of 20,000 bushels of wheat on the market in Chicago, Illinois, and a subsequent sale thereof made on defendant's account at a less price per bushel. The amount sued for was the difference in the buying and selling price less $222.50, which defendant had to his credit with plaintiff, the whole or a part thereof growing out of prior transactions in the wheat pit on the Chicago board of trade.

The defendant, answering, in substance, alleged that the plaintiffs were commission merchants in Chicago and dealt and traded in what are known as options on 'change, by buying and selling in market on 'change for future delivery, when, in fact, no delivery was ever made or intended or demanded, and no grain was bought or sold or intended to be; that the whole transaction was a venture and speculation on margins depending for profits or loss on fluctuations of the market, and a purely fictitious and gambling transaction, without consideration; that the account sued upon is claimed for loss in so trading in options, was without consideration, wholly void, as plaintiffs well knew, and in violation of law and contrary to public policy. From the foregoing a clear conception is gained of the issues involved and upon which the case went to trial.

Upon the submission of plaintiffs' evidence, the defendant moved the court to instruct the jury to return a verdict for the defendant upon the ground, among others, "that the testimony of the plaintiffs introduced in this case fails to make out a case or support a judgment in their favor, but on the contrary shows beyond all question that the transaction upon which the suit is brought and upon which such testimony is based was a dealing in margins on the board of trade in the city of Chicago, and is a gambling contract and absolutely void, and is against public policy." The motion was sustained, and the jury peremptorily instructed to return a verdict in favor of the defendant, which was done, and a judgment in his favor rendered on the verdict. From this judgment plaintiffs prosecute error proceedings in this court.

While some other questions are presented by the record, as we view the case, it is proper, and necessary only, to notice the ruling of the trial judge on defendant's motion to peremptorily instruct the jury to return a verdict in his favor, and we shall therefore confine our consideration of the case to the one question mentioned. It is for us to determine only whether, under the evidence, the

peremptory instruction given was justified, or, in other words, whether the evidence introduced by plaintiffs would sustain a verdict if rendered in their favor.

The only evidence submitted was in the form of depositions, and consisted of the testimony of one of the plaintiffs, including the telegraphic and written correspondence which passed between the parties to the action and relating to the transactions out of which the suit grew, and the testimony of one other witness, a member of the board of trade, who testified to certain customs thereon prevailing and the meaning of certain words used on the board of trade, such as "options," a "put" or a "call."

In the deposition of the plaintiff, after identifying a series of letters and telegrams passing between the parties and testifying in relation to them, the witness was asked to state how he arrived at the amount due, to which he replied:

"As before stated, at the time we made the purchase of the 10,000 bushels of wheat, Mr. Marriott [the defendant] had to his credit on our books the sum of $218.89. On the first of March we find that he was entitled to a credit of $3.61 for an error made in an account of sale, which we had sent him prior to this time—that, with the $218.89, gave him a credit on our books of $222.50. The money that we obtained on the sale of his 20,000 bushels of wheat amounted to the sum of $1,643.75 less than we paid for the wheat, which we charged to his account. We also charged to his account $25—being for commissions upon this transaction. We then deducted the credit from the debit, which shows a balance as per account herewith, of $1,446.25 due us on the 18th of March, 1892."

Other questions to, and answers by, this witness were as follows:

"Q. State whether or not these purchases of four 5,000 bushel lots of wheat were actual purchases of grain?

"A. They were.

"Q. And for Marriott's account, were they?

"A. Yes.

"Q. Is there any custom on the board of trade with regard to keeping margins in the hands of commission merchants by persons who are not members of the board and who make purchases or sales through members of the board?

"A. It is customary to require a margin of money on transactions made by board to protect commission merchants from loss by the decline or advance in the market.

"Q. The defendant says in his answer that your firm on the 26th day of February and the 17th day of March, 1892, dealt and traded in what are known as options, on 'change in Chicago, in grain by selling and buying in the market in Chicago for future delivery, in the firm name of H. W. Rogers & Bro., when, in fact, no delivery was ever made or intended or demanded and no grain was bought or sold or intended to be—I will ask you whether or not this paragraph of the answer which I have just read is true, with reference to the transactions about which you testified yesterday?

"A. It is not.

"Q. Does your firm deal in options?

"A. It does not—it is not permitted on the board of trade.

"Q. What is an option?

"A. An option is a privilege whereby the purchaser for a consideration paid is entitled within a specified time to call upon the seller or not as he elects for grain, stocks or whatever the trade is for at an agreed price, deliverable to him at once or at some future date, usually at some future date.

"Q. State whether or not the transactions such as you have just described are permitted on the board of trade.

"A. That sort of a trade is gambling under the laws of the state of Illinois and is forbidden by the board of trade, nor has it been permitted on the board of trade since the law was enacted over twenty years ago,—if, indeed, it was ever recognized.

"Q. Did the transactions that you had with Marriott

partake of the nature of such transactions as you have just described?

"A. No, sir, not in the least.

"Q. Is it true, as stated in his answer, that no delivery was ever made or intended or demanded and no grain was bought or sold or intended to be, in either of these transactions which you testified about yesterday?

"A. My answer to that is, it is not true, but utterly false, except that the wheat was not actually delivered, but it would have been delivered to us and paid for, if Mr. Marriott had kept a margin with us against loss. It was sold before maturity of the contracts and was settled under the rules and regulations of the board of trade.

"Q. The answer of defendant further states that the whole transaction was a venture and speculation on margins depending for a profit or loss on fluctuations of the market, and was a fictitious and gambling transaction— state whether or not these purchases of 20,000 bushels of wheat were fictitious and gambling transactions?

"A. Not in the least.

"Q. Neither fictitious nor gambling?

"A. No, sir.

"Q. State whether or not there was any option about these purchases of 20,000 bushels of wheat, except as to the time of delivery.

"A. That was all the option there was about that, and that was a limited option.

"Q. What was the option?

"A. The option was that the party might deliver the wheat any day between the first and last days of May, 1892.

"Q. He could select his date?

"A. He could select his date and the buyer would be obliged to take the grain.

"Q. Is it true that your firm did not intend to take and receive the 20,000 bushels of grain which you bought, as you stated yesterday?

"A. It is not.

"Q. What was your intention at the time you made these purchases?

"A. Our intention was to take and pay for the grain when it would be delivered.

"Q. Were all these real purchases?

"A. They were real and *bona fide* purchases of wheat.

"Q. And by reason of these purchases your firm has been compelled to pay out this amount of money on Mr. Marriott's account, to-wit, $1,643.75?

"A. Yes, sir."

We have quoted at length from the testimony of plaintiff as to his version of the transaction under consideration. With respect to it, we may say that it is regarded by us as being for the most part conclusions of the witness rather than testimony of positive acts or of things done and said which more certainly establish the true nature and character of the transaction, and that such testimony must be taken in connection with, and weighed in the light of, the antecedent transactions, which must after all determine the truth or falsity of the answer of the defendant.

A large number of telegrams and letters passed between the parties with reference to the nominal purchases of wheat, which, with the sale thereof, furnish the basis for plaintiffs' action. It is only necessary to consider a few of these, from which a satisfactory deduction can be arrived at as to the nature of the relations existing between the plaintiffs and defendant. It is proper to say, first, that, from all the written evidence in the case, it is made to appear that, prior to the transactions at present under consideration, the plaintiffs had in form purchased, and sold at an advance over the purchase price, a lot of wheat for account of the defendant, the gain or profit of such transaction being placed to the defendant's credit in the account herein sued on.

We copy the following report of the plaintiff as to the purchases of the wheat referred to:

CHICAGO, Feb. 9, 1892.

"*J. T. Marriott, Esq., Wakefield, Neb.*: We herewith confirm the following trades made for your account and risk today, upon condition that we shall have the right to close these purchases or sales at our discretion, whenever the usual margin, or such margin as has been agreed upon, is not kept good:

| Quantity. | Property. | Price. | Time of delivery. |
|---|---|---|---|
| Bought 5000 | No. 2 Wheat | 89⅜ | May |

"H. W. ROGERS & BRO."

On February 12 plaintiff received a telegram in cipher from defendant, which witness interpreted as follows:

"If market rallies to 92, sell out my long No. 2 spring wheat. If market breaks to about 88, buy for my account five thousand, then sell out my long wheat about 90; and then if market breaks to about 88, buy for my account ten thousand May wheat."

"On the 15th of February, '92," says the witness, "I sold his five thousand bushels of long wheat at 91⅞."

"Q. What is the meaning of the word 'long' in board of trade circles?

"A. It means property bought."

The report of the sale was made by wire and also by letter. It appears that the defendant made $100 on the foregoing transaction.

February 20, 1892, defendant wired plaintiff as follows: "Buy at about 93½, ten thousand May—2 spring wheat; then keep on buying ten thousand for one cent decline or advance."

Under this order, ten thousand bushels of wheat for May delivery were purchased, and the defendant was asked by letter to make further remittance for margins. Says the plaintiff: "You will readily see that the amount of money which you have to your credit, $218.89, is a very small margin even for 10,000 bushels, and as the market

is very active nowadays, it would be altogether inadequate as margin on your further orders."

On February 26 another cipher dispatch from defendant was received by plaintiffs, reading, when interpreted, as follows:

"Buy at about 92—10,000 May No. 2 wheat. Then sell out my long No. 2 wheat about 93½ cents."

Says the plaintiff: "In pursuance of that telegraphic order we purchased five thousand bushels of No. 2 spring wheat to be delivered in May, 1892, at 92½ cents per bushel and five thousand more at 92 cents per bushel for the same delivery, and both for the account of John T. Marriott."

The plaintiffs, in reporting the above purchases to the defendant, say: "We purchased for your account 5000 May at 92 and 5000 at 92½ and wired you asking you to remit us $500. Up to the present writing we have received no reply. The market closed fairly steady but not strong, and while we sincerely hope we may be able to get the price you mention, the prospects are a little faint at present."

It is not amiss to note here that both parties were contemplating selling the "trades," as these transactions are termed, as soon as the condition of the market would permit of a profit being realized, and that there is not in any of the communications the remotest suggestion or inference of an actual delivery at any time or of any intention of an actual transfer of wheat to the defendant.

After the purchase of the 20,000 bushels of wheat for May delivery, as hereinbefore narrated, much correspondence passed between the parties as to the state of the market, its decline, and the cause therefor, interspersed with much urgent solicitation and expostulation on the part of the plaintiffs for remittances from defendant for "margins," and with equal earnestness and surpassing ingenuity on the part of the defendant delaying, upon one pretext or another, a compliance with such demands, until finally the climax was reached, and the defendant's

53

"trades" closed out at a decline in the market price equal to the amount sued for, plus the sum of the defendant's credit on the books of the plaintiff. It will avail nothing to pursue this correspondence with minuteness.

On February 20, the plaintiff writes: "At tonight's market $90\frac{1}{4}$ your margin is all exhausted and $331.00 besides. We are not in a position to margin your trades for you hence we call. * * * The bears appear to have control of the mkt. at present and will undoubtedly force prices lower next week as everything appears to favor them at present."

On February 29 the plaintiff writes the defendant, in part, as follows: "We are in receipt of your favor of 26th which came late Saturday night, and while we think the market may react, possibly enough to let you out, we have not got as much confidence as you appear to have, and we wish you would advise us at once of the remittance or shipment to protect us on this deal."

On March 7 plaintiffs write: "The wheat market has declined again today and your trades are about $800.00 behind tonight. Now we can not carry this property much farther and may have to sell it the first thing in the morning."

In none of the communications between the parties to the suit does it appear that there was any intention of making an actual transfer of wheat, the commodity alleged to have been bought. There is an entire absence of any fact or circumstance tending to show that the defendant was desirous of having delivered to him, or to any one for him, any wheat during the month of May, or at any other time. Not a word is said as to an intended delivery of wheat at any time, place or to any person. The word "wheat" and "May delivery" are evidently used only for the purpose of identifying the commodity and the price of that commodity at a fixed time upon which the speculative venture is based. No wheat is in sight. No wheat is referred to, except in general terms as above mentioned. No warehouse receipts, or any evidence of

a similar nature, are anywhere existent, or alluded to, disclosing an intention to buy or sell the property itself rather than to speculate in its market value. Nothing is asked for by the plaintiffs from the defendant except margins to protect them against loss by reason of a falling market. They appear to be in nowise concerned as to the intention or ability of the defendant to receive or pay for the commodity at the time it is deliverable. It is entirely within the bounds of a proper discussion of the case to say that it is firmly established by the evidence, and that it was well known to the plaintiffs that the defendant was scarcely able financially to comply with their demands for margins on a slight decline in the market; and it appears that he could not do even that. To entertain the belief that he was able to pay, at the current price, for 20,000 bushels of wheat, is simply preposterous. It logically follows, and the conviction is overwhelming, that no actual delivery of wheat was ever intended or contemplated by either party. It is a matter of common knowledge that many million bushels of wheat are annually in form bought and sold upon the Chicago board of trade which are not in existence, never change hands and are never intended to. That such trades are mere speculations in the fluctuations of the market price of the commodity referred to, is a self-evident truth. Perhaps not one per cent of the purchases and sales of wheat upon 'change represent *bona fide* transactions and actual. delivery of the property itself. The writer, however, professes no accurate or definite knowledge of the ratio of "paper trades" to the transactions involving actual and genuine sale and delivery of such commodity. Clearly, the transactions representing *bona fide* sales, with the intention of actual delivery of the thing purchased, are but a small part of the sum total, and the most natural and probable inference would be that any one of the many transactions constantly occurring would fall within the category of speculative ventures, and are in fact wagering contracts.

Nothing appears in the evidence as to the rules of the board of trade for the settlement of these contracts for the purchase and sale of the different commodities thereon dealt in as between the members thereof; nor do we deem such evidence essential for a proper disposition of this case. We have to do here more with the relations between the plaintiffs and the defendant with respect to the transactions and attendant circumstances connected with this suit.

We apprehend the true test, in a controversy similar to the one under consideration, is whether there was in the minds of the parties to the transaction—that is, the plaintiffs and the defendant—an intention, in good faith to purchase the property, in form bought, and to secure a *bona fide* transfer and actual delivery thereof to the purchaser. It is not to be doubted that a valid contract for the future delivery of wheat, even though not in the possession of the seller, may be entered into, and such contract would be upon the same plane and as valid and binding as any other legal obligation for the sale and delivery of any species of personal property. Nor do we question the soundness of the proposition that, where such a contract is entered into by one of the parties thereto in good faith, the same would be valid and binding, even though the other party to the contract entered into it with no intention to effect a genuine transfer of property, but merely as a gambling transaction and speculative venture on the fluctuation of the price of the commodity nominally dealt in. See *Pixley v. Boynton,* 79 Ill., 351; *Wolcott v. Heath,* 78 Ill., 433.

We are not to overlook the fact that the present litigation is between the plaintiffs, acting as brokers, and the defendant, who, so far as the alleged purchase of the grain mentioned is concerned, was their undisclosed principal; and while the rules, general to all contracts between principals for purchase and sale of personal property challenged as wagering contracts, obtain here, yet there exist some distinguishing features where the con-

troversy is between an agent and his principal regarding the same transaction.

There is nothing disclosed by the evidence as to the party or parties from whom the nominal purchase of wheat was made, nor does it appear that any third party, in any way, enters into the transaction.  Nor are we able to shut our eyes to the obvious conclusion that the purchases were made upon 'change on the Chicago board of trade upon the general offerings to sell and buy at the market quotations prevailing on the day the purchases are supposed to have been made, and entirely without reference to the commodity itself, or to the actual delivery of the property purchased.

As affecting the liability of the principal to his agent in a transaction of the kind under consideration, the following statement of law to a jury by a presiding judge in Pennsylvania, which was afterwards approved by the supreme court of that state and reported in the case of *Fareira v. Gabell*, 89 Pa., 91, seems well in point, and we can do no better than quote in full that part of the charge referring to the subject: "A like question arises for the consideration of the jury in this case—that is to say, whether the intention was that the defendant should become an actual buyer and vendor of stocks through the agency of the plaintiff, or whether the plaintiff expressly or impliedly agreed to act as the defendant's agent in gambling sales and purchases of stocks, which the defendant had not the means to deliver, and which it was no part of his intention to receive.  If the jury find that the transaction was a gambling one on Gabell's part [the principal], and known to be such by Fareira [the broker], and that the services and advances which constitute the cause of action were made and rendered in carrying it into effect, their verdict should be for the defendant; and it does not necessarily vary the legal aspect of the case, that some, or the greater number of the persons with whom Fareira dealt, on Gabell's account, were actual buyers and sellers, and did not intend to gamble; al-

though, if such be the fact, it may be taken into view by the jury in determining the true nature of the contract as between Gabell and Fareira. * * * I am clearly of opinion that one who should undertake to make a bet or wager for another, and advance the money staked, would have no right of action against his principal in the event of loss; and I can see no difference between such a case and that of an agent who renders services and expends money in conducting any other gambling operation."

Bluntly stated, the only rational conclusion to be reached from the evidence in this case is, that in the transactions hereinbefore set forth it was not the intention of the defendant, in fact and truth, to purchase for actual transfer and delivery the wheat nominally bought on his account, but to engage in a wagering venture for speculative purposes on the rise and fall of the market, and the plaintiffs were of necessity, from the circumstances of the case, in privity with him and had facts before them to be abundantly advised of his gambling intentions, and any contract, express or implied, growing out of such transactions is void as against public policy and public morals.

Lord Mansfield, in the case of *Holman v. Johnson*, 1 Cowp., 343, commenting on the subject, tersely says: "The objection, that a contract is immoral or illegal as between plaintiff and defendant, sounds at all times very ill in the mouth of defendant. It is not for his sake, however, that the objection is ever allowed; but it is founded in general principles of policy, which the defendant has the advantage of, contrary to the real justice, as between him and the plaintiff, by accident, if I may so say. The principle of public policy is this: *ex dolo malo non oritur actio*—[from fraud a right of action does not arise]. No court will lend its aid to a man who founds his cause of action upon an immoral or illegal act. If, from the plaintiff's own stating or otherwise, the cause of action appears to arise *ex turpi causa* [from a bad cause], or the transgression of a positive law of this

country, there the court says he has no right to be assisted."

In *Rudolf v. Winters*, 7 Nebr., 128, Chief Justice GANTT, speaking of similar matters, says: "It is very clear that such a gambling contract is *contra bonos mores* and against public policy; and the doctrine is well settled, that whenever a contract is founded on an illegal transaction, or grows out of an illegal act, or is so connected with it as to be inseparable from it, the law will not sanction it. * * * It may be said that it has become an axiom in the law, that when a claim is bottomed on an immoral and illegal transaction, no right whatever can be founded upon such contract which the law will sanction or the courts maintain."

In *Sprague v. Warren*, 26 Nebr., 335, Justice MAXWELL, in writing the opinion for the majority of the court, says: "Real contracts for the delivery of property at a future time will be sustained, because parties then deal with actual property. Where, however, there was no intention to deliver the property, but simply to pay the difference between the contract price and the price on the day agreed upon, the contract will not be enforced, as in fact it is a mere wager. It is the duty of courts and juries, therefore, to scrutinize these time contracts very closely, and see whether they were really intended by the parties as contracts for the purchase and delivery of the property."

"Neither," says Judge MAXWELL, "will it do to attach too much importance to the form of the instrument, for it is always possible for the parties to conceal the true nature of the transaction by complying with the outward forms of the law. It is the duty of the courts, therefore, where the validity of the contract is challenged, to receive evidence outside of the words of the contract, and examine the facts and circumstances which attended the making of it, in order to ascertain, if possible, whether it was intended as a *bona fide* transaction for the purchase and delivery of the property, or merely colorable." Fur-

ther in the same case it is said: "The case has all the ear-marks of a gambling transaction, and it devolves upon the defendants in error to show that the purchase of the grain was *bona fide*, and for actual delivery." See, also, *Watte v. Wickersham*, 27 Nebr., 457.

In this case, the testimony was neither conflicting nor contradictory, except, perhaps, in so far as the parol testimony of the plaintiff may be inconsistent with the letters and telegrams passing between the parties and which constitute the contract between them and determine the nature thereof. It is largely a matter of construction of the evidence, its legal effect to be deduced and given force and effect. If from it but one rational conclusion can be drawn, if it is not of such a nature to warrant different conclusions by reasonable men, then it becomes entirely proper for the trial judge to treat the case as having been resolved into questions of law, and to suitably instruct the jury accordingly. See *Dehning v. Detroit Bridge & Iron Works*, 46 Nebr., 556; *Woolsey v. Chicago, B. & Q. R. Co.*, 39 Nebr., 798; *Omaha St. R. Co. v. Craig*, 39 Nebr., 601.

We are irresistibly drawn to to the conclusion, from plaintiff's own evidence, that the contract was based on a wagering transaction; that there was, in fact, no intention on the part of the parties to this suit to engage in a *bona fide* purchase to be followed by an actual delivery of the commodity in which they nominally dealt, and that such transaction was a gambling venture and speculation in the fluctuation in the price of wheat in the markets, and the same is therefore void and non-enforceable in the courts of justice, as being contrary to public policy. The ruling of the lower court complained of is right, and is, therefore

AFFIRMED.