FARMERS COOPERATIVE SHIPPING ASSOCIATION, APPELLEE, V. GEORGE A. ADAMS GRAIN COMPANY, APPELLANT.

FILED JUNE 25, 1909. No. 15,763.

1. **Corporations: CONTRACTS: AUTHORITY OF AGENT.** The agent or manager of a corporation organized under the laws of this state for the purpose of buying grain and live stock direct from producers, and selling and shipping the same to the general markets, and the operation of grain elevators to be used incidentally for that purpose, has no apparent authority to engage in speculations in grain and mess pork upon the Chicago board of trade; and where the evidence shows that no actual authority was given the agent to engage in such transactions, and they were carried on without the knowledge or consent of any of the officers of the corporation, it will not be bound thereby.

2. ———: ———: ULTRA VIRES. A corporation so organized, with an authorized capital stock of $10,000, and a limitation to the amount of its indebtedness to $2,000, has no power to engage in speculative transactions in mess pork and grain upon the Chicago board of trade amounting in a single day to more than $40,000, and such transactions are *ultra vires* and void.

3. **Contracts**: VALIDITY. The transactions in question examined, and *held* to be gambling transactions within the rule announced in *Rogers & Bro. v. Marriott*, 59 Neb. 759.

APPEAL from the district court for Douglas county: WILLIS G. SEARS, JUDGE. *Affirmed.*

*W. J. Connell* and *Walter P. Thomas*, for appellant.

*T. J. Mahoney* and *J. A. C. Kennedy, contra.*

BARNES, J.

Action to recover a balance alleged to be due plaintiff from defendant on account of grain sold and delivered. There was a jury trial, and at the close of all of the evidence the court directed the jury to return a verdict for the plaintiff, and the defendant has appealed.

As to the following facts there is no conflict in the evidence, and they are established beyond dispute: The plaintiff was incorporated according to the laws of this state, and its articles of incorporation provided that its place of business should be at Gretna, in Sarpy county. Its business should be the buying, selling and shipping of grain and live stock and the doing of such things as were necessarily incident thereto. Its total authorized capital stock was $10,000, and the amount of indebtedness which it was authorized to contract at any time was limited to $2,000.

On the first day of December, 1903, plaintiff employed one O. C. Higbee to operate and manage its grain elevator situated at Gretna and to perform all work incident thereto, the contract of employment specifying the incidents and details of the management of the elevator. That no express authority was ever given to Higbee beyond what is found in his written contract of employment; that, although the articles of incorporation authorized the plaintiff to deal in live stock, it never availed itself of that power and never dealt in anything but grain; that,

51

aside from the speculative transactions in question herein,
plaintiff never dealt in futures, margins or board of trade
transactions of any kind whatsoever, and never trans-
acted any business except the buying, shipping and
handling of grain through its elevator at Gretna; that
from the 12th day of December, 1903, to the 10th day of
August, 1904, the plaintiff shipped and sold to the defend-
ant large amounts of grain out of its elevator at Gretna,
aggregating in value more than $18,000; that against
those shipments the plaintiff made drafts on the defend-
ant from time to time as the grain left its elevator, and
that these drafts were paid; but whatever amounts the
grain realized in excess of the drafts were not remitted
by the defendant to the plaintiff except the sum of $19.48,
which was remitted about the last of August, 1904, and
that, if the account between the parties is limited to the
grain shipped by the plaintiff to the defendant and the
money received by draft or otherwise for such grain, an
accounting between them would leave the defendant
indebted to the plaintiff in the amount for which a ver-
dict was directed and judgment was entered in this case.

It appears, however, that the defendant attempted to
set off the amount which it owed an account of actual
shipments of grain by another account growing out of
speculative transactions on the board of trade, some of
which were conducted with Higbee in his own name, and
others with him in the name of the plaintiff. It further
appears that the board of trade transactions commenced
more than a month after the first actual shipment of grain
by the plaintiff to the defendant, and that they were orig-
inally commenced by Higbee in his own name, and not in
the name of the plaintiff. The account shows losses to
Higbee, aggregating $268.75, and this account appears to
have been balanced by transferring Higbee's losses to the
account of the plaintiff. In this manner Higbee's ac-
counts were squared and his losses were all charged on
the defendant's books against the plaintiff. That this was
done without Higbee's consent, but later on such consent

was obtained from him ostensibly in the plaintiff's name and for the plaintiff's account. Thereafter Higbee, without the knowledge of the plaintiff, conducted a large number of speculative board of trade deals with the defendant in the name of the plaintiff. In these transactions there appears to have been various profits and losses which the defendant carried into its general account with the plaintiff, intermingling such items with actual shipments of grain from plaintiff's elevator at Gretna. A great many of the board of trade transactions were in mess pork, while the others were in grain. The net result of the transactions was a loss of $2,544.48, which the defendant charged on its books against the plaintiff. This net item of loss, added to the $268.75 lost by Higbee in his own name, amounts to a total of $2,813.23 which defendant attempted to set off against the amount which it owed the plaintiff for actual shipments of grain, which, if set off, would balance the account, and this is the exact amount for which the court directed the jury to return its verdict, plus interest from the date of the commencement of the action.

The questions which are presented by the record are: First, did Higbee have any actual or apparent authority to embark in the board of trade transactions for and on behalf of the plaintiff, such as would estop it from repudiating them? Second, were the board of trade transactions within the scope of the plaintiff's powers, or were they *ultra vires* and void? Third, were the board of trade transactions *bona fide* lawful contracts or were they mere gambling transactions, speculations on the rise and fall of the price of grain upon the future market?

As bearing upon the first inquiry, it appears beyond dispute that, throughout all of the transactions above described, the agent, Higbee, concealed from his employer, the plaintiff, the fact that such transactions were taking place. It further appears that the plaintiff had an auditing committee which met regularly every month and went over Higbee's books, but found thereon no trace or record

of any of the board of trade transactions in question; that Higbee kept a register account in which appeared only the transactions growing out of the actual shipments of grain from the Gretna elevator, and that no entry of any kind was made therein relating to said speculative deals. It also appears that Higbee absconded in the latter part of August, and on the 25th day of that month, in the year 1904, just a day or two before he left the state, he entered upon the plaintiff's books a lump credit to the defendant of $2,890.55, which was the first entry of any of the transactions in question which appeared upon the plaintiff's books. After Higbee absconded, he sent by mail the key to the box in which plaintiff's books of account were kept to the president of the corporation, and none of its officers or directors had any knowledge of any of the transactions in dispute until they opened the box and obtained possession of their books of account. Now, the authority given by the plaintiff to Higbee is found in his written contract of employment. The language of this contract is: "The party of the second part (Higbee) has this day covenanted and agreed with the party of the first part (plaintiff) to operate and manage the elevator of said party of the first part situated in Gretna, Nebraska, and to perform all work incident to said operation and management." It thus appears that the plaintiff never gave Higbee any actual authority to engage in the transactions in dispute. Under this contract his authority was limited to managing the grain elevator situated at Gretna, and as incident to that management he would have the power to buy grain for future delivery at said elevator and advance a part of the purchase price thereon to responsible parties. But this would not include the buying of grain on margins, with advancements through a broker to parties whose identity, as well as their solvency, would be utterly unknown to him. The contract is clear, specific and unambiguous, and contains all of Higbee's actual authority. It limited that authority to the management and operation of the plaintiff's ele-

vator at Gretna. It gave him no permission to engage in speculations on the board of trade, even if such trades had been *bona fide* transactions. The authority of an agent does not extend to any matter or transaction which is not properly incident to the management of the ordinary business of his principal. Clark and Marshall, Private Corporations, p. 2119. We are therefore of opinion that Higbee had no actual authority to engage in the transactions in question for and on behalf of the plaintiff.

This brings us to the question of Higbee's apparent authority. It is well established that the authority of an agent cannot be established by his own acts and declarations. Thus, if A declares himself the agent of B, and then proceeds to enter into contracts in B's name, this is not a holding out by B of A as his agent. The holding out is done by the agent himself. Consequently, when we speak of the apparent authority of an agent as binding his principal, we mean such authority as the acts or declarations of the principal give the agent the appearance of possessing. Closely related to this doctrine of apparent authority, and really a part of it, is the doctrine of estoppel under which a party who has knowingly permitted others to treat one as his agent will be estopped to deny the agency. Now, what did plaintiff do to give Higbee any appearance of authority to embark in the board of trade deals? The evidence shows that it hired him to operate and manage its elevator at Gretna and put him in charge thereof, and that is all that it did in the way of affirmatively giving him an appearance of authority. Authority to operate the elevator, as we have already stated, was no authority to engage in the transactions in question. It is elementary that an estoppel to question the acts of an agent can arise only from a knowledge of his acts. Now, the evidence in this case shows that Higbee kept an account with the defendant on the books of plaintiff. That account dealt with the grain actually shipped from the Gretna elevator and the money received by drafts against that grain, and does not con-

tain a single item referring to the board of trade trans-
actions until the 25th day of August, 1904, when he was
preparing to abscond. He then, for the first time, credited
the appellant with $2,890.55 on those matters. The books
also show that he carefully concealed all of those ventures
from the plaintiff. It further appears that the plaintiff
had never engaged in buying grain for delivery anywhere
except at its elevator at Gretna, or in selling any grain
except such as was to be delivered out of that elevator.
Again, the plaintiff's articles of incorporation, which were
open to public inspection, disclosed the full extent of its
powers, and showed upon their face that the plaintiff was
not organized for the purpose of speculating on the board
of trade; that its principal business was the buying and
selling of grain and the building and conducting of coun-
try elevators and the business incident thereto. The
plaintiff's stationery used by Higbee in conducting his
correspondence with the defendant disclosed the fact that
its capital stock was only $10,000, and that the amount of
indebtedness which it could contract at any time was
limited to $2,000, and yet we find from the evidence that
the deals between the plaintiff and the defendant entered
into on the 4th day of July, 1904, if consummated, would
amount to $44,487.50, and this in the name of a concern
that the defendant knew had a gross capital of $10,000
and whose articles of incorporation limited its indebted-
ness to $2,000. It therefore seems clear that Higbee had
no apparent authority to engage in the transactions in
question, and that the defendant was chargeable with
knowledge of the want of such authority on his part. For
this reason alone, if for no other, the district court prop-
erly directed the verdict for the plaintiff.

Our determination of the foregoing question renders it
unnecessary for us to decide any of the other questions
presented by the record. We may say in passing, how-
ever, that it seems quite apparent that the plaintiff under
its articles of incorporation had no power to engage in
the board of trade transactions in question; that they were

*ultra vires* and therefore void. We may further say that we have examined the question of the validity of those transactions, and are satisfied that they fall clearly within the rule announced in *Rogers & Bro. v. Marriott,* 59 Neb. 759, and cases there cited, and therefore are void as against good morals and public policy.

For the foregoing reasons, the judgment of the district court is

AFFIRMED.

REESE, C. J., absent and not sitting.