GEORGE HALL, APPELLANT, V. JOHN W. DAVIS: A. R. ROBERTS ET AL., APPELLEES.

FILED OCTOBER 4, 1920.  No. 21091.

Gaming: SPECULATION IN WHEAT. "Evidence examined, and *held* that the only conclusion to be reached from the plaintiff's evidence is that the contract was based on a wagering transaction, and that there was, in fact, no intention on the part of the parties to engage in a *bona fide* purchase to be followed by an actual delivery of the commodity in which they nominally dealt, and that such transaction was a gambling venture and speculation in the fluctuation in the price of wheat in the markets, and is void as being contrary to public policy." *Rogers & Bro. v. Marriott*, 59 Neb. 759.

APPEAL from the district court for Lancaster county: WILLARD E. STEWART, JUDGE. *Affirmed.*

*Berge & McCarty* and *Sterling F. Mutz*, for appellant.

*Smith, Schall & Howell, contra.*

LETTON, J.

Action for money had and received. Plaintiff is a farmer living near Alvo. In 1916 defendant Davis was managing an elevator at Alvo for Elliott Lowe, the owner of the elevator. Plaintiff alleges that he formed a partnership with Davis for the purpose of dealing in grain, and that he furnished him from time to time with money, amounting in all to about $25,000, for the purposes of the business; that Davis, without his knowledge or consent, and instead of buying actual grain, paid the money to the defendants, A. R. Roberts Commission Company, and the other defendants, in the course of illegal and gambling transactions and speculating on margins. He alleges that he was entirely innocent and ignorant of these transactions, and that defendant Roberts, having received the money illegally, must pay it back.

The defense, in substance, is that the partnership was formed for the purpose of dealing on the board of trade in

Hall v. Davis.

futures upon margins; that the plaintiff had full knowledge of all transactions; that the money was paid with full knowledge and approval of plaintiff; and he is estopped to maintain this action.

At the close of the testimony on behalf of plaintiff, each of the defendants made a separate motion that the court direct a verdict in his favor upon the ground, among others, that the transaction was a gambling transaction, and that the plaintiff was *particeps criminis*. These motions were sustained, and from a judgment dismissing the case, plaintiff appeals.

In the brief of defendants it is said: "We will assume that Hall lost money in his grain transactions, and that such were gambling transactions." Counsel for plaintiff in the reply brief says: "In our brief we argued that plaintiff's money was lost in gambling, and now having the admission of counsel that the money was so lost we are one step nearer the actual facts in the case." And further: "The only question in the case now is whether the plaintiff participated in this gambling or acquiesced in it if he knew about it." We also quote from plaintiff's brief: "Whether the parties honestly intended to deal in grain or use the contract as a cover for bidding on the rise and fall of its price on the market is a question of fact to be determined by what the parties did in pursuance with the contract and other competent evidence."

It must be conceded that, for the purpose of the motion, the testimony of plaintiff must be taken as true. His testimony in chief supports in the main the allegations of his petition, but his cross-examination discloses that he appears to be possessed of a "double personality," and we must consider his whole evidence and view it in the light of common experience. In chief he testifies that Davis had been operating the elevator at Alvo for one Elliott Lowe; that he first met defendant A. R. Roberts when Davis and he went to his office in the Terminal building in Lincoln early in 1916; that they had practically formed the partnership before they went to Roberts' office.

He also testified in answer to questions, in substance: I did not know that any one could deal in margins in Robert's office; I did not understand what dealing in margins was, or that Roberts was a member of the board of trade in Chicago, or that Roberts was engaged in anything else than handling actual grain. Between June, 1916, and else than handling actual grain. Between June, 1916, and the latter part of April, 1917, I furnished the partnership about $27,000. I never bought or sold any grain myself during that time. Davis did all the business and issued all the checks. During all this time I did not know how Davis was using the money. I did not know that any of the money was used to buy grain in Chicago. I had no grain delivered and never had any money back. After the business was concluded Davis handed me the checks, drafts and other papers which are in evidence. I did not know that there was an account of Hall & Davis in the office of Roberts. During the whole time I believed that Davis was actually buying and selling actual grain. I did not know that Davis was dealing in margins.

Upon cross-examination, however, he testified, in substance, as follows: When I bought grain at Alvo for my cattle it was a cash transaction and I usually paid the whole price within a short time. I never bought grain from the elevators and paid down three cents a bushel. I had no place to store grain except what was ordinary on a farm, and had no interest in an elevator at that time.

In June, 1916, when I was in Roberts' office in Lincoln, the chairs in the room were arranged about like jury chairs, arranged in a body and close together. There was a blackboard on the wall. I saw the words "corn," "wheat," and "oats," on the blackboard. Andy was putting figures down. I read them because I was interested in the market. There were men in the room. I do not remember of seeing the names of any months on the blackboard, but would not say they were not there. I understood this represented the price of grain, but did not know really, did not remember, if it said Chicago, St. Louis, or Kansas City. I did not understand about the board, was looking at it to

try and understand it. I saw the figures, but did not read them. I might have seen that the figure was a six, and some other figures that were under the column headed "wheat," and others under the columns headed "corn," "oats," "rye," etc. I do not recall having seen "wheat," "oats," and "corn" on the board. I do not remember of sitting with any one. Davis was in the room. Andy was the man that looked after the board. I met him that day for the first time. (A check for $150 given by Hall & Davis is among the exhibits.) I did not buy 5,000 bushels of wheat that day. The check of $150 was given by Davis that day. I knew before we got out of town that I had done some business before we left. "Q. You knew that you had bought or sold 5,000 bushels of wheat, didn't you? A. I knew, I don't just remember about the number of bushels. * - * * Q. You did know, however, that you had done something about some wheat, didn't you? A. Yes, sir. I knew * * * that $150 would not buy 5,000 bushels of wheat." Wheat was worth about $1 a bushel. I did not suppose I had 150 bushels. I thought Davis had purchased 5,000 bushels of wheat and he had paid for it with this check.

"Q. Where did you think that 5,000 bushels of wheat was when you bought it; after you bought it, where did you think it was located? A. I did no thinking about it. Q. You did not know whether it was in the moon or in the sun? A. No, sir. Q. Or in Chicago, or in the Alvo elevator? A. No, sir; I did not. * * * Q. You knew then and you know now you did not have any place to put it, didn't you, if they delivered it to you? A. Yes, sir. * * * Q. And you did not ask them where this wheat was, did you? A. No, sir. * * * Q. And so far as you know there never was any such wheat, was there, as far as you know? A. As far as I know. * * * Q. And you intended that money to be checked out by Davis in the name of Hall & Davis to buy wheat as you have described in the manner we have gone over, this morning, is that right? A. Yes, sir. * * * Q. In the

manner in which he drew the first check? A. Yes, sir.
* * * Q. And you borrowed money when they would
tell you they needed some more up here to protect these
trades, didn't you? A. Yes, sir. * * * Q. And Davis
kept telling you that they wanted more money to pro-
tect these wheat deals, didn't he; and then you would
go, if you didn't have it, and get it from the bank? A.
Yes, sir. Q. And then put it in the bank account in
the Farmers & Merchants Bank, and Davis would check it
out? A. Yes, sir. * * * Q. And you checked it out
or ordered him to check it out in order to apply on those
wheat deals, didn't you? A. Yes, sir. * * * Q. Then
you put up money whether you sold wheat or whether
you bought wheat, didn't you? A. Yes, sir. Q. It was
common knowledge for years and years on your part,
wasn't it, that there was a board of trade in Chicago, to
trade in wheat and corn and oats? A. Yes, sir; that
was common knowledge. Q. You knew that? A. Yes,
sir. Q. You had heard the word 'futures' spoken of, too,
hadn't you? A. I have heard of 'futures.' Q. Yes, with
reference to grain? A. Yes, sir. Q. And you had heard
'margins' spoken of, hadn't you? A. Yes, sir."

He also testified that before he dealt with Roberts he had
dealt with Elliott Lowe; that Lowe had a board upon the
wall and he sat and watched this board. It had "wheat,"
"oats," "corn," etc., on it, and a man put figures under-
neath. He had one trade with Elliott Lowe; bought 5,000
bushels of corn from him and received a confirmation no-
tice similar to those they got from Roberts; did not pay the
market price it might have been three cents a bushel—
never paid any more than that for corn—could not say
whether he won or lost. He paid Davis money so he
(Davis) could make other deals. "Q. Well, how much
did you lose in your deals with Elliott Lowe? A. I
should judge somewhere around $300." He also testified
that he would sit with Davis about twice a week and hear
him talk over the telephone to the Roberts Commission
Company. Speaking of his final transaction with Roberts,

in which he gave a promissory note in settlement:" Q. And you wanted to settle for the difference according to the prices which then were and quit? A. I wanted to settle that difference up. Q. The difference between you according to the prices and then quit? A. Whatever difference there was. Q. You wanted to settle up the difference? A. Yes, sir. Q. You didn't want and didn't ask that the wheat change hands, did you? A. No, sir."

The conclusion we draw from all the testimony is that plaintiff was not so childlike and unsophisticated as he alleges. It is clear that the sole business in which the firm of Hall & Davis embarked was not the *bona fide* buying and selling of actual grain. They did not expect to receive or deliver a single bushel, and had no facilities for its storage. The transaction was purely speculative. Plaintiff was *particeps criminis* with defendant in a gambling transaction. The case is within the rule of *Rogers & Bro. v. Marriott*, 59 Neb. 759, *Farmers Cooperative Shipping Ass'n v. Adams Grain Co.*, 84 Neb. 752, *Ives v. Boyce*, 85 Neb. 324, *Boon v. Gooch*, 95 Neb. 678, and *Sunderland & Saunders v. Hibbard*, 97 Neb. 21, and the motion was properly sustained.

AFFIRMED.