WATKINS GRAIN COMPANY, Appellant, v. FRASER SMITH COMPANY, Ltd. and FRASER SMITH COMPANY, Appellees.

No. 43263.

MAY 12, 1936.

Alan Loth, for appellant.

J. W. Morse and N. J. Lee, for appellees.

ANDERSON, J.—Many of the material facts involved are in dispute as between the appellant and appellees, both in the abstract of record and the amendments thereto, as well as the briefs and arguments of the respective parties, and it has been necessary for us to resort to the certified transcript of the record to satisfy ourselves as to what the record actually contains. The following is a summary of the situation as we conclude from the record:

The plaintiff, appellant, Watkins Grain Company, is an incorporation and is what is ordinarily known as a "Farmers Elevator Company". It owns and operates two elevators in the little town of Watkins, Benton county, Iowa. It has a president and secretary and a board of seven directors most of whom are farmers within the vicinity of the little town. The defendants are corporations, and affiliates, one of which is located in Minneapolis, Minnesota, and the other in Milwaukee, Wisconsin. Their business is acting as commission men and dealing in buying and selling grain and also dealing in what is known as "futures", that is, buying and selling farm commodities for future delivery. The defendant located in Milwaukee is a member of the Milwaukee Board of Trade where farm commodities are bought and sold for cash and on margins or options for future delivery. It appears that the Milwaukee Board of Trade, about the year 1922, adopted a rule governing its members as to certain transactions in the purchase or sale of commodities for future delivery. This rule is substantially as follows:

"Any member, firm or corporation accepting orders for the purchase or sale of any of the commodities dealt in under the rules of this association for future delivery, from a nonmember corporation, shall obtain in advance from such nonmember corporation a written authorization to the effect that the manager

or officer of said corporation giving such order, or orders, is duly authorized by his corporation to buy or sell such commodities for future delivery under the rules and regulations of this association for the account of his corporation, and the name shall be entered upon the books of the aforesaid member, firm or corporation accepting the same in the name of the corporation for which the order or orders were made. In addition to the regular confirmation prescribed by the rules, written notice of each transaction shall be mailed to some executive officer of the said corporation, other than the manager or officer giving the order.''

The rule further provides punishment by suspension for any violation thereof and following the rule appears the comment that it was adopted at the suggestion of a joint conference committee on grain marketing problems in a meeting called by the then Secretary of Agriculture, Henry Wallace. It further appears that the purpose of the rule is to protect nonmember corporations; and in order to simplify its administration, the Milwaukee Grain and Stock Exchange will keep on file in its secretary's office the written authorization ''for future delivery'' trading submitted by the various associations and corporations transacting business on the Milwaukee market.

In connection with the enforcement of the foregoing rule, a printed blank form of authority headed ''Authorization for Future Trade'' was prepared and used, and which, in substance, includes a certificate in substantially the following language:

''That a meeting of the directors of the undersigned corporation on the ——— day of ——— a resolution was adopted that ——— as manager, or officer of this corporation, be hereby authorized to make and execute orders and contracts for the purchase or sale of any commodities dealt in under the rules of the Milwaukee Grain & Stock Exchange for future delivery, and that the executive officers of this corporation are as follows: ———————. Executed, &c this ——— day of ——— 19 —, By ———————, President. Attest, ——————— Secretary. Affix Corporate Seal.''

The plaintiff elevator company was engaged in buying and selling farmers' grain, and also dealt in feeds, seeds, coal, and lumber, tile, and sand.

About the 1st of April, 1931, J. C. Pederson was employed

by the directors of the Watkins Elevator Company at a regular meeting as manager. All of the officers and the directors of the plaintiff elevator company were present at this meeting. Their testimony is to the effect that their instructions to the said Pederson at the time of his employment was to conduct the business of the elevator company and to buy and sell grain on a basis of two cents a bushel profit, and that the company had never dealt in futures or bought and sold grain for future delivery, and that there was to be no speculating and no dealing in so-called futures on any board of trade. Mr. Pederson, testifying for the defendants in this case, denies any such specific instructions and says that the subject of dealing in futures was not mentioned at the meeting. However, we are satisfied that it was mentioned, and that the officers and members of the board were interested in preventing such trades and speculations by reason of some unpleasant and unprofitable experience along that line with another manager some ten years prior to the employment of Pederson.

In November, 1931, Pederson, contrary to the explicit instructions of his employer, bought 6,000 bushels of corn through the defendant companies for December delivery at 45 cents a bushel. On the first of December he sold this option contract for 37½ cents per bushel, or at a total loss, including commission and tax, of $465.23. On the next day following the purchase of the first option of 6,000 bushels, Pederson purchased 3,000 bushels of corn for May delivery, and later sold such option contract at a total loss of $547.60. On December 2d, the date that he closed out the first option, above mentioned, Pederson bought 6,000 bushels of corn for May, 1932, delivery and on April 15th, following, sold the option contract at a loss of $525.-21, and on the same date bought 6,000 bushels of July corn for delivery in that month, and also 3,000 bushels of the same option and later sold the option contracts at a loss of $841.25. He later purchased 9,000 bushels of September corn for delivery during that month and on September 9, 1932, closed out the option contract at a net loss of $80.15.

Pederson's transactions and dealings in futures thus resulted in a total loss to his employer of $2,459.24. All of the transactions in futures as detailed above were with the defendant companies. It appears without dispute that the said transactions were entirely without the knowledge, consent, or acqui-

escence of the plaintiff elevator company, and it further appears that in the written and oral reports made by Pederson to the officers and board of directors monthly he did not include therein, or advise the officers and directors in any manner, that he was carrying on such transactions in the name of the plaintiff. He kept no records in the company's office showing in any way that such peculations were being indulged in, and when he was asked by an auditor of the company, at a time when the trading was going on, he stated that there were no options or future tradings existing. And on the first of January in each year during his employment, inventories of the business were taken by Mr. Pederson and presented to the officers and board of directors of the plaintiff, and in none of these inventories was any record or mention made of any outstanding contracts of grain or purchases for future delivery. Mr. Pederson claims that about the 17th of November, 1931, when he first commenced the trading in futures, there was about 9,000 bushels of corn owned by farmers stored in the elevators at Watkins, and that it was heating and would have to be gotten rid of, and he also claims that he so reported to the board of directors and they told him to get the corn out of the elevators and get rid of it, and that he sold and shipped the 9,000 bushels of stored corn and bought the options as a hedge against such sale. The members of the board of directors deny that they gave any such direction to the manager, Pederson. They testify that they instructed him to notify the farmers owning the stored corn to either sell it or take it out of the elevators. They also testify, and we conclude such to be the fact, that there was considerably less than 4,000 bushels of stored corn in the elevators at the time in question. And one of the directors who inventoried the corn on hand says that there was less than 2,000 bushels of stored corn in the elevators at the time. Pederson claims that it was necessary, for the protection of the plaintiff, to buy a future option to protect the plaintiff against the sale of 9,000 bushels of stored corn sold by him. Of course, it was not necessary to buy 9,000 bushels of corn for future delivery to protect against the sale of 2,000 bushels of stored corn, and the record fairly shows that none of this stored corn was sold by the plaintiff except upon the orders of the farmers owning the same. The testimony shows that there might have been 2,000 bushels of stored corn remaining in the elevator for a week or two, but that was the extent of the stored corn during the

year 1931, and that most of such stored corn had been purchased and was owned by the plaintiff. Pederson never reported to the board and did not show in any of his books or records that he had sold any corn owned by farmers and stored in the elevator. The plaintiff company did not know and did not find out anything about Pederson's dealing in futures until a complete audit of the business was made early in 1934, when he was found short in his accounts and then the facts were disclosed not by anything in the records in the office, but by an investigation of Pederson's accounts with the defendant companies. The losses resulting from Pederson's peculations were covered by him by permitting the defendant companies to retain the proceeds of corn shipped to them for sale and by payment of various amounts by check. And such payments were concealed by Pederson from his employer by inaccurate and false entries in the books of the company.

It appears without controversy that the defendant companies violated the rule of the Milwaukee board of trade hereinbefore quoted. They claim that they prepared the blank form for authority for future trading, but no one testifies that it was ever mailed to or received by the plaintiff company. It is certain that no such blank form was ever received by any officer or director of the plaintiff company, and it is also certain that the same was never executed by the officers of the company and filed with the Milwaukee board of trade. It also appears that a letter was written by the Fraser Smith Company, Limited, the Milwaukee corporation, defendant, stating that they were inclosing authorization blanks "which you will kindly have filled out by your president and secretary and return to the secretary of the Milwaukee Grain and Stock Exchange at your earliest convenience. It is necessary to have this authority from your directors according to our rules." It is also made certain that if such letter and blanks were mailed, they were either addressed to Pederson himself, or to the Watkins Grain Company and received by Pederson and never came to the attention of any of the officers or directors of the plaintiff company. It also appears that confirmations of the various trades were mailed to Pederson, or the Watkins Grain Company, but that they never were called to the attention of the officers or board of directors of the plaintiff company, and that the plaintiff company at no

time had any information as to the existence of any of the transactions involving trades in futures.

The record shows without substantial dispute that the practice of so-called "hedging" had never been indulged in by the plaintiff company; that Pederson was never told to hedge; that he was directly and explicitly told not to speculate or deal in futures on the board of trade; that none of the plaintiff's officers ever knew of the so-called hedge or of dealings in future trades; that such dealings were concealed from them by Pederson, even to the extent of falsifying his books; that the rule adopted by the board of trade of Milwaukee is explicitly to the effect that when hedging is practiced or when trades in futures are contracted they must be authorized in writing; that no such authorization was ever obtained; that the defendant companies violated this rule in entering into the trades in futures without obtaining such authorization; and that they also violated the rule by omitting to mail notices or confirmations of the various trades in futures to any officer of the plaintiff company other than its manager; no express authority to hedge or deal in futures is claimed by the defendants. They seek to imply the authority from the nature of Pederson's office as manager, but all such implications are negatived by the express provisions of the quoted rule, and, in the face of the definite provisions in the rule, apparent authority of Pederson to make and enter into the trades in question cannot be implied.

The questions then which it is necessary to answer are: First, Would Pederson have any actual or apparent authority to embark on trade transactions for and on behalf of the plaintiff, such as would estop it from repudiating them? second, Were the transactions in futures bona fide, lawful contracts or were they merely gambling transactions, speculation on the rise and fall of grain upon the future market?

As bearing upon the first question, it appears without conflict that throughout all of the transactions hereinabove described Pederson concealed from his employer the fact that such transactions were taking place. Actual authority to engage in the transactions in question was entirely wanting and in fact such transactions were in direct conflict with Pederson's explicit instructions. In the case of Farmers Co-op. Shipping Association v. Adams Grain Company, 84 Neb. 752, 122 N. W. 55, 57, there was a state of facts almost identical with the facts we have

found existing in the case at bar, except in that case the contract of employment was in writing and was silent as to any authority of the agent to engage in speculation or transactions in futures, and in that case the Supreme Court of Nebraska said:

"The authority of an agent does not extend to any matter or transaction which is not properly incident to the management of the ordinary business of his principal." And the court held that the agent had no actual authority to engage in the transactions in question. Further discussing the situation, the Nebraska Supreme Court used the following language: "This brings us to the question of Higbee's apparent authority. It is well established that the authority of an agent cannot be established by his own acts and declarations. * * * Consequently, when we speak of the apparent authority of an agent as binding his principal, we mean such authority as the acts or declarations of the principal give the agent the appearance of possessing. Closely related to this doctrine of apparent authority, and really a part of it, is the doctrine of estoppel under which a party who has knowingly permitted others to treat one as his agent will be estopped to deny the agency. Now, what did plaintiff do to give Higbee any appearance of authority to embark in the board of trade deals? The evidence shows that it hired him to operate and manage its elevator at Gretna and put him in charge thereof, and that is all that it did in the way of affirmatively giving him an appearance of authority. Authority to operate the elevator, as we have already stated, was no authority to engage in the transactions in question. It is elementary that an estoppel to question the acts of an agent can arise only from a knowledge of his acts. Now, the evidence in this case shows that Higbee kept an account with the defendant on the books of plaintiff. That account dealt wieh the grain actually shipped from the Gretna elevator and the money received by drafts against that grain, and does not contain a single item referring to the board of trade transactions until the 25th day of August, 1904, when he was preparing to abscond. * * * The books also show that he carefully concealed all of those ventures from the plaintiff. It further appears that the plaintiff had never engaged in buying grain for delivery anywhere except at its elevator at Gretna, or in selling any grain except such as was to be delivered out of

that elevator. * * * It therefore seems clear that Higbee had no apparent authority to engage in the transactions in question, and that the defendant was chargeable with knowledge of the want of such authority on his part. * * * Our determination of the foregoing question renders it unnecessary for us to decide any of the other questions presented by the record. We may say, in passing, however, that it seems quite apparent that the plaintiff * * * had no power to engage in the board of trade transactions in question; that they were ultra vires, and therefore void. We may further say that we have examined the question of the validity of those transactions, and are satisfied that they fall clearly within the rule announced in Rogers v. Marriott, 59 Neb. 759, 82 N. W. 21, and cases there cited, and therefore are void as against good morals and public policy.''

In the case at bar the facts are much stronger in supporting plaintiff's case than appears in the Nebraska case, above quoted. In the present case, as we have found, the agent, Pederson, had no authority, by reason of his employment, to engage in the transactions in question and in fact had explicit instructions not to do so. No general custom prevailing is shown in the record, and the fact is undisputed that the plaintiff elevator company had never dealt with the defendant companies in any future trades, until the ones in question. In addition to these facts, we must consider the rule of the Milwaukee board of trade requiring special authorization from the officers and directors of the plaintiff corporation authorizing its manager to engage in the buying and selling of grain for future delivery. Without such authorization, the defendants could not contract with the plaintiff's agent and would not be permitted to assume any apparent authority on the part of such agent. The board of trade rule referred to negatives the existence of any custom permitting such transactions and negatives implied or assumed authority on the part of the agent to enter into transactions involving futures. The rule as contained in The Restatement of the Law of Agency of the American Law Institute, Vol. 1, p. 395, section 161, relied upon by appellees as follows:

"A general agent for a disclosed or partially disclosed principal subjects his principal to liability for acts done on his account which usually accompany or are incidental to transactions which he is authorized to conduct if, although they are forbidden

by the principal, the other party reasonably believes that the agent is authorized to do them and has no notice that the agent is not so authorized,''

furnishes no support for the appellees' position in this case for the reason that the rule gave the appellees notice that without the required authorization there was no authority to hedge or deal in futures as incidental to the employment of the agent, and appellees could not reasonably believe that there was authority either express, apparent, or implied.

The trial court found the transactions in question here a hedge, but he still had to find that it was authorized in order to sustain it, and he finds such authorization because the officers of the plaintiff elevator company should have known what was going on. He did not find any actual knowledge, but, in substance, denied them recovery because they were negligent in not finding out that the unauthorized transactions were being conducted.

The cases of Fraser v. Farmers Co-op. Co., 167 Minn. 369, 209 N. W. 33, 913, Farmers Elevator Co. v. Quinn-Shepherdson Co., 47 S. D. 438, 199 N. W. 201, and other cases cited and relied upon by the appellees are not in point. The facts are not at all parallel with the facts in the instant case.

The appellees attempt to avoid the illegality of the contracts by the claim that the transactions in question were a ''hedging'' as against the sale of stored corn belonging to farmers, and that such hedging was a custom of trade and recognized as a legal transaction. We have found that no such custom existed and the fact that these transactions commenced on November 17, 1931, and continued for more than a year would negative the thought of any legitimate hedge, even if such thing was customary and even if it was authorized by the plaintiff company. The first option was closed out in a couple of months at a loss, and other future options were purchased, and these were successively sold and repurchased at least three times with losses resulting in each transaction. This course of dealing indicates plainly that there was no intention at any time during the progress of the transactions that delivery of the corn would be made in the future. If this is true, as it must be,

''we are irresistibly drawn to the conclusion * * * that the contract was based on a wagering transaction; that there was in fact no intention on the part of the parties to this suit to en-

1174

gage in a bona fide purchase, to be followed by an actual delivery of the commodity in which they nominally dealt, and that such transaction was a gambling venture, and speculation in the fluctuations in the price of wheat in the markets, and the same is therefore void, and nonenforceable in the courts of justice, as being contrary to pnblic policy." Rogers v. Marriott, 59 Neb. 759, 82 N. W. 21, 26.

Even though there was some amount of stored corn in the plaintiff's elevator at the time the alleged hedging contract was entered into, the evidence shows without dispute that the hedging contracts were for future delivery of corn far in excess of any amount of stored corn as shown by the record, and such excess would certainly be a gambling contract against public policy and good morals, and would vitiate the whole transaction.

Much reliance seems to be made by the appellees on the findings of the trial court, as they refer repeatedly to such findings as supporting their contentions here. To this the answer must be that the case is presented in this court de novo, and, after a careful study of the record, we are constrained to hold that the trial court erred in its finding, both as to law and fact, and that there should have been a finding, decree, and judgment sustaining the plaintiff's cause of action and entering judgment against the defendants for the plaintiff in the aggregate amount claimed in its petition.

It necessarily follows that the finding, judgment, and decree of the trial court should be and is hereby reversed and the case is remanded with directions to enter a decree and judgment in conformity with this opinion.—Reversed.

DONEGAN, C. J. and ALBERT, KINTZINGER, MITCHELL, HAMILTON, PARSONS, STIGER, and RICHARDS, JJ., concur.