SUNDERLAND & SAUNDERS, APPELLANTS, V. FRANK B. HIBBARD, APPELLEE.

FILED OCTOBER 16, 1914.  No. 17,861.

1. **Gaming:** INTENT: ACTION FOR COMMISSION. In an action by an agent against a principal to recover for alleged commissions and money advanced for the principal in transactions involving alleged purchases of grain on the Chicago board of trade for future delivery, the question is whether the intention was that the principal should become the actual buyer of grain through the agency of the commission merchants, or whether they expressly or impliedly agreed to act as the principal's agents in gambling purchases of grain which the principal had no intention of receiving.

2. ———: TRANSACTIONS OF BOARD OF TRADE: EVIDENCE. Evidence examined, and *held*, that the only conclusion to be reached from the testimony is that the contract was based on a wagering transaction; that there was in fact no intention on the part of the parties to engage in a *bona fide* purchase, to be followed by an actual delivery of the commodity in which they nominally dealt; that such transaction was a gambling venture and speculation in the fluctuation in the price of wheat in the market, and was a violation of the provisions of section 8816, Rev. St. 1913, and contrary to public policy.

3. ———: ENFORCEMENT OF CONTRACT. In such a case the courts of this state will not aid either party to the transaction.

APPEAL from the district court for Douglas county: LEE S. ESTELLE, JUDGE. *Affirmed.*

*Duncan M. Vinsonhaler,* for appellants.

*George A. Magney, contra.*

BARNES, J.

Action in the district court for Douglas county to recover the sum of $5,593.75, with interest thereon at the rate of 7 per cent. per annum from June 1, 1910, alleged to be due from defendant to plaintiffs for money paid and commissions earned for him by plaintiffs in dealing in wheat on the Chicago board of trade from the 16th day of June, 1908, to the 31st day of May, 1910. Plaintiffs'

amended petition set out the several transactions in full. To this petition the defendant filed an answer, denying every allegation contained therein, except such as were specifically admitted, and as one of his defenses to the action it was alleged that on the date set forth in the petition the plaintiffs were in the commission business in Omaha, Nebraska, and Chicago, and during all of said time dealt and traded in what are known as options on 'change in Chicago and Omaha in grain and provisions by selling and putting in the market on 'change certain grain for future delivery, when in fact no delivery was ever intended and demanded, and no grain was bought or sold or intended to be bought or sold; that on the dates stated in said petition the defendant took an option of said plaintiffs on grain as aforesaid for future delivery, when in fact no delivery was ever intended or demanded, and no grain was bought or sold or intended to be bought or sold, and that the same is true in every instance whether the defendant bought grain for future delivery or sold grain for future delivery, as stated in said petition. Defendant further alleged that all the transactions referred to in said petition were ventures and speculations on margins depending for profit or loss on the fluctuations of the market, and were purely fictitious and gambling transactions, and that in all of said transactions no consideration was received or paid, and that the amount claimed in said petition is for a pretended loss in said dealings in said options at the time stated in said petition, and is without consideration and wholly void, and in violation of the law and contrary to public policy, all of which the said plaintiffs well knew. As a further defense it was alleged that it was understood and agreed between plaintiffs and defendant, in reference to all of said transactions set forth in said petition, that whenever the margins paid to the plaintiffs by defendant in said transactions were exhausted by the raising or falling of the market the plaintiffs were to close out the deal before there should be any loss; that defendant never in any manner authorized plaintiffs to pay or be responsible for any sums of money whatever for the

defendant.    Plaintiffs filed a reply which, in substance, was a special denial of the facts alleged in defendant's answer.    The cause was tried to a jury, and resulted in a verdict and judgment for the defendant, and the plaintiffs have brought the case to this court by an appeal.

On the trial plaintiffs called one M. P. Miller as a witness, who testified, in substance, that he was employed by the plaintiffs; that plaintiffs were engaged in the grain, commission and provision business, and acted as commission merchants between parties who bought or sold through them; that he had been acquainted with the defendant for five years; that the defendant had been a customer for fully three years, and that he had frequently received orders from the defendant in plaintiffs' office, either in person or by telegraph; that upon receipt of the orders plaintiffs would telegraph the same at once over their wire to Bartlett, Patten & Company, their correspondents, who would thereupon wire back that they had executed the order, and he would enter it on plaintiffs' books and notify defendant, sending him a confirmation by mail addressed to defendant at Irvington, Nebraska.    The witness identified exhibits 1, 2, and 11 as having been sent to Mr. Hibbard by plaintiffs over the Western Union Telegraph.    Exhibit 11 reads as follows:  "5/27/10.  F. B. Hibbard, Irvington, Neb.    Market very weak.    Please come in if possible."  The witness then testified that the next day after sending this telegram Mr. Hibbard called at the plaintiffs' office; that Hibbard stood by the desk of the witness watching the market reports; that the market was still going down; that witness said to defendant, "What do you wish to do?" and defendant replied, "I will go down and see Carl first (that meant his son at South Omaha)," that defendant went down, and the witness expected him to come back in the afternoon and fix the matter up; that the defendant at that time had purchased through plaintiffs 130,000 bushels of September wheat; that at the time the defendant was in the office he had told him that his margin was just about exhausted, and that plaintiffs needed more margins; that defendant did not return, and he heard noth-

ing from him; that on the 31st day of May plaintiffs wired their Chicago correspondents to sell the 130,000 bushels of September wheat, and that their correspondents wired back that they had done so; that thereupon he mailed to defendant exhibits 4, 5, 6, 7, 8, 9, 10 and 12; that the loss as a result of this sale was $17,087.56. Plaintiffs thereupon offered in evidence exhibits 3 to 12, inclusive, to which defendant objected as being irrelevant, immaterial and incompetent. The objection was overruled, and the exhibits were received in evidence. A copy of one of them will be sufficient for the consideration of this appeal. Leaving out the letter-head, exhibit 10 reads as follows:

"F. B. Hibbard, Omaha, Neb., May 31, 1910. Subject to the rules, regulations and customs of the board of trade of the city of Chicago, or the exchange in which this order is executed; and any rules, regulations and requirements of its board of directors, and all amendments that may be made thereto, we have this day sold for your account, and risk through Bartlett, Patten & Company 10 Sep. wheat 90¼. Sunderland & Saunders."

The witness explained that the item of commissions appearing on exhibit 12 was a charge made by the plaintiffs of one-eighth of a cent a bushel for all grain bought and sold, and of this commission plaintiffs received one-half and their Chicago correspondents one-half; that the plaintiffs were required to keep and deposit with their Chicago correspondents a sufficient margin to protect all their trades made through that correspondent, and that the plaintiffs had paid to Bartlett, Patten & Company the loss resulting from this transaction with Hibbard, and of that loss the sum of $5,593.75 had never been repaid by defendant or any one in his behalf.

On cross-examination Miller further testified that he had been in the employ of plaintiffs since the 25th day of May, 1907; that he was at present the manager having general supervision of the business; that the orders for purchases and sales were handled by him; that he handled all of the orders of defendant during the year 1909, and from 1909 up to date; that the plaintiffs required a deposit

of one cent a bushel at the time of placing the order, and at the time of the conversation with defendant on May 28 defendant's margins were exhausted, but previous to that time he had had a margin; that he had told defendant that his margin was about exhausted, and in response to the question, "So that it was not entirely exhausted when you talked with him at that time? A. It may have been; it may have been a little more than exhausted. * * * Q. Well, now, then, what did you mean a while ago when you said it was about exhausted? A. Because, when we accept an account which is nearly exhausted we notify the party to that effect, and we would expect him to put up more margin to protect us in case the market goes further down." Without quoting further from the testimony of the witness, it is sufficient to say that he testified, in substance, as follows: When the plaintiff purchased wheat for the defendant it was always for future delivery; that all of defendant's transactions were in the future; that when they telegraphed an order to Bartlett, Patten & Company in Chicago they would go on the board of trade and buy or sell; and that Bartlett, Patten & Company would wire them of the execution and the same day mail them confirmation; that plaintiffs did not notify the defendant of the name of the party who bought or sold the wheat; that when they bought or sold wheat for defendant they did not inquire where the wheat was, and that defendant never asked, nor did they ever tell him, where it was; that they did not give him any receipt for it; that the only thing they gave him was a written confirmation; that they had never during all of the dealings with the defendant delivered a bushel of wheat to him; that, in regard to the 130,000 bushels of wheat sold to defendant Hibbard, they did not know that the wheat was in a warehouse in Chicago, and did not give Hibbard anything showing where it was, because they could not until it was delivered; that the transactions of the plaintiffs for the defendant were executed in the pit of the board of trade in Chicago; that all defendant ever paid on the transaction, or all that he was ever asked to pay, were

margins; that as a rule two cents a bushel is all the margin required for wheat, and that they always aimed to keep in defendant's account about one cent a bushel ahead of the market.

It must be observed that of the 130,000 bushels of wheat above referred to there never was a word said by either party about where the wheat was or where it was to come from. The plaintiffs did not know where the wheat was or whether it would be in existence or not when September came. They never gave the defendant a warehouse receipt, and all they ever required him to pay was margins, and all the transactions were executed in the pit of the board of trade in Chicago.

The defendant Hibbard testified, in substance, that in all of the transactions set out in the petition he had never received any of the grain purchased; that there never was anything said about receiving or delivering the grain at any time; that he never asked, nor was he ever told, where the corn was; that he never had any of the grain that he sold, and that they never gave him any warehouse receipt, or ever spoke to him about a warehouse receipt; that he was never told where the wheat or corn was stored or where it would come from; that he was never told where they got their market report, except from Chicago; that the statements that were furnished in each instance showed that whatever was done was done on the Chicago board of trade; that he had not raised any kind of grain for years; that he was never asked by plaintiffs to pay for any grain he bought, nor did he ever receive pay for the grain he sold, except where there were margins in his favor, and that the only money he was required to pay was to keep up the margins at two cents a bushel.

The foregoing statements from the testimony of Mr. Miller and the defendant Hibbard cover practically all of the evidence on this branch of the case, and there is no testimony given by any other witness that contradicts their statements. It therefore seems clear that neither party to these transactions ever intended the actual delivery of a single bushel of wheat or corn supposed to be involved

in the transactions set out in plaintiffs' petition. Usually when men actually buy and sell 130,000 bushels of wheat within a short time, it is expected to be delivered and paid for. They usually say something about where the grain is, and where and how it is to be delivered, and business men who buy and sell in good faith are not likely to close transactions of such magnitude and importance without a thorough understanding as to all of such details. Sutherland & Saunders never expected to be called upon to deliver this wheat, and certainly the defendant Hibbard never dreamed of such a thing. The question therefore is: Were the transactions within the inhibition of sections 8816-8819, Rev. St. 1913?

Section 8816 provides, among other things: "Every person who shall, as principal or as agent of any corporation or person or persons, set up and carry on a bucket-shop, or any person who shall accept employment from any person or persons or corporation engaged in the carrying on of a bucket-shop, and shall, under such employment in any manner or capacity, assist in carrying on a bucket-shop * * * shall be guilty of a felony. A 'bucket-shop' is defined to be an office, store, board-of-trade room, or other place wherein the proprietor or keeper thereof, or other person or agent, either in his or its own behalf, or as an agent or correspondent of any other person, corporation, association or copartnership within or without the state, conducts the business of making or offering to make contracts, agreements, trades or transactions respecting the purchase, or purchase and sale, of any stocks, grains, provisions, cotton or other commodity or personal property wherein said proprietor or keeper or patron contemplates or intends that the contracts, agreements, trades or transactions shall be, or may be, closed, adjusted or settled according to or upon the basis of the market quotations or prices made on any board of trade or exchange where there is competitive buying and selling, and upon which the commodities or securities referred to in such contracts, agreements, trades or transactions are dealt in, and without a *bona fide* transaction on such board

Sunderland & Saunders v. Hibbard.

of trade, or wherein such keeper, proprietor or patron shall contemplate or intend that such contracts, agreements, trades or transactions shall be or may be deemed closed or terminated, when the market quotations of prices made on such board of trade or exchange for the articles or securities named in such contracts, agreements, trades or transactions shall reach a certain figure, and also any office, store or other place where the keeper, person or agent or proprietor thereof, either in his or its own behalf, or as an agent as aforesaid therein, makes or offers to make, with others, contracts, trades or transactions for the purchase or sale of any such commodity, wherein either party thereto do not contemplate or intend the actual or *bona fide* receipt or delivery of such property, but do contemplate or intend a settlement thereof based upon differences in the price at which said property is or is claimed to be bought and sold."

Considering the testimony in the light of the statute above quoted, it seems clear that the transactions in question in this case were inhibited by law. The same question was before this court in *Sprague v. Warren*, 26 Neb. 326, where it was held that no recovery could be had on like transactions. The same question was again before the court in *Rogers & Bro. v. Marriott*, 59 Neb. 759. The testimony in that case was very like the evidence in this case, and it was there held that the only conclusion which could be reached from the plaintiffs' evidence was that the contract was based on a wagering transaction, and that there was in fact no intention on the part of the parties to engage in a *bona fide* purchase, to be followed by an actual delivery of the commodity in which they nominally dealt, and that such transaction was a gambling venture and speculation in the fluctuation in the price of wheat in the markets, and was void as being contrary to public policy. In *Boon v. Gooch*, 95 Neb. 678, it was held: "The enactment of this statute did not affect the previous doctrine of this court, and that an action to recover the amount paid to a bucket-shop as margins cannot be maintained." It was said in the body of the opinion: "It will

be seen that this view has prevailed for more than 35 years, and that the courts of this state have consistently refused to lend their aid to either party in such transactions. The enactment of the statute of 1907 imposing a penalty upon the bucket-shop keeper in nowise operated to change the nature of the contract or the relations of the parties. * * * The transaction was illegal wherever conducted."

We think it is needless to review the cases from other states, and we are constrained to hold that the plaintiffs were not entitled to recover in this case. This view renders it unnecessary for us to discuss or determine the question of the giving of instruction No. 5.

The judgment of the district court is

AFFIRMED.