VAN DUSEN-HARRINGTON COMPANY v. N. JUNGEBLUT.

January 20, 1899.

Nos. 11,379—(231).

**Broker—Purchase of Wheat "Futures."**

The plaintiff corporation, a broker and member of the Chamber of Commerce at Minneapolis, received from defendant an order to purchase 5,000 bushels of May wheat for him, and executed the order according to the usage and custom of the business. *Held:*

**Same—Authority of Broker to Advance Margins for Customer.**

1. From the course of dealing between plaintiff and defendant, stated in the opinion, it conclusively appears that it had implied authority from him to advance money to pay his margins, and continue the deal so made for him.

**Same—Presumption—Custom of Local Market.**

2. It must be presumed that defendant gave plaintiff authority to make

the deal in question according to the usages and customs prevailing in the market in which the deal was to be made.

## Same—Sale and Purchase by Corporations with Same Officers.

3. According to such custom, plaintiff had a right, on the failure of defendant to pay margins, to close out the deal by selling the same on the open board of the chamber, which it did, and the deal was purchased by another corporation, some of whose officers are officers of plaintiff.

## Same.

4. In the absence of any showing that any prejudice resulted to defendant from the fact that the two corporations were thus related, that fact alone is not sufficient to avoid the sale.

Action in the district court for Hennepin county to recover $250. The cause was transferred to the district court for Ramsey county and was tried before O. B. Lewis, J., and a jury. At the trial there was evidence tending to show that the wheat bought for defendant was sold by plaintiff to G. W. Van Dusen & Company, a corporation for which plaintiff acted as broker, the transaction consisting in the representative of plaintiff going upon the floor of the Chamber of Commerce and as agent of defendant selling, while as agent of G. W. Van Dusen & Company, he bought, the wheat. The other facts appear in the opinion. At the close of the trial the court directed a verdict in favor of plaintiff. Subsequently the motion of defendant for judgment in his favor, notwithstanding the verdict, was granted. From the order granting this motion, plaintiff appealed. Reversed.

*Wilson & Van Derlip,* for appellant.

The answer being but a general denial, defendant could not prove that the transaction was illegal, as being a mere wager on the future price of wheat. Dodge v. McMahan, 61 Minn. 175. The request to make advances of margins was implied, as the payment was made according to the usages and customs of the market, with which defendant was familiar. 27 Am. & Eng. Enc. 885, 886; 23 Id. 733; 2 Id. 573; Mechem, Ag. § 989; Watts v. Howard, 70 Minn. 122. A request to undertake an agency or employment, the proper execution of which does or may involve the loss or expenditure of money, operates not only as an implied request, on the part

of the principal, to incur such expenditure, but also as a promise to repay it; so that the employment of a broker to sell property for future delivery implies both an undertaking to indemnify the broker in respect to the execution of his agency, and a promise on the part of the principal to repay or reimburse him for such losses or expenditures as may become necessary, or as may result from the performance of his agency. Bibb v. Allen, 149 U. S. 481, 499; Edwards v. Hoeffinghoff, 38 Fed. 635, 643; Kirkpatrick v. Adams, 20 Fed. 287; Hansen v. Boyd, 161 U. S. 397, 406; Field v. Farrington, 10 Wall. 141, 149; 1 Am. & Eng. Enc. 1117. The plaintiff made the advances in question as required by the rules of the Chamber of Commerce. The payments were therefore compulsory. The fact that he paid without awaiting a special demand from the clearing house would not make the payments voluntary. The rules constituted an imperative demand upon all members. See Bibb v. Allen, supra; Fowler v. New York, 67 N. Y. 138. In the absence of an express agreement, the compensation of a broker, or factor, is determined by the usages of the trade. 4 Am. & Eng. Enc. 970. The fact that an individual is interested in two different corporations does not prevent the corporations from dealing with each other. 3 Thompson, Corp. § 4079.

*John F. Fitzpatrick*, for respondent.

Contracts in form for the future delivery of goods, not intended to represent actual transactions but merely to pay or receive differences in price, are void as against public policy. Mohr v. Miesen, 47 Minn. 228; Irwin v. Williar, 110 U. S. 499. An agent cannot sell to a firm of which he is a member, or act for both buyer and seller. 23 Am. & Eng. Enc. 726; Crump v. Ingersoll, 44 Minn. 84, 47 Minn. 179; Levy v. Loeb, 85 N. Y. 365.

CANTY, J.

The plaintiff corporation is a member of the Chamber of Commerce of Minneapolis. On January 11, 1897, plaintiff received from defendant the following letter:

"You will please purchase for me 5,000 bushels No. 1 May wheat at 78 cents, and advise. Yours truly, N. Jungeblut."

Plaintiff executed the order the next day on the open board of the chamber, notified defendant at his place of business in St. Paul to that effect, and requested him to send check for $250. He sent the check the same day,—January 12,—stating:

"Enclosed $250, option on 5,000 bushels May wheat."

On January 28 defendant wrote plaintiff as follows:

"I note from today's market report that my margins on the purchase of 5,000 bushels May wheat are exhausted, and herewith enclose check for $150 additional margins."

May wheat continued to fall until April 7, when it had fallen to 64⅜ cents, and plaintiff called on defendant for $400 more margins, which he refused to put up, and on the next day plaintiff closed out the deal for the 5,000 bushels at 65⅛ cents per bushel, leaving a loss or deficiency below the amount of margins so put up by him of $243.75 and $6.25 commissions, or a total of $250. This action is brought to recover this amount.

Defendant did not plead that it was a gambling transaction, and, as he did not set up any such illegality in his answer, was not able to make the defense on the trial. Dodge v. McMahan, 61 Minn. 175, 63 N. W. 487.

At the close of the trial each party moved that the court direct a verdict in his favor. The judge granted the motion of plaintiff, and ordered a verdict for it for $250. Defendant thereafter moved for judgment notwithstanding the verdict, or for a new trial. The court ordered judgment that plaintiff take nothing, and that defendant recover his costs and disbursements. From this order plaintiff appeals.

1. It is contended by respondent that he never requested or authorized plaintiff to pay out the money for him, and that it should have closed out the transaction as soon as the margins put up by him had run out. The monthly statement sent him by plaintiff January 30 contains the following notice:

"On all marginal business the right is reserved to close transactions when margins are running out, without giving further notice, and to settle contracts in accordance with the rules and customs of the Minneapolis Chamber of Commerce."

Similar notices were sent in the monthly statements of March and April. It appears by the evidence that, according to such rules and customs, this closing out was done by going upon the open board of the chamber, and selling to the highest bidder the interest of the purchaser (or seller, as the case might be) in the particular deal.

Respondent claims that under the above notice plaintiff was bound to act on this rule, and close out the deal when his margins were exhausted. We cannot so hold. The notice merely reserved to plaintiff the right to close it out. We are of the opinion that by the course of dealing between the parties it conclusively appears that plaintiff had implied authority to advance money for defendant in order to keep up and continue the transaction on his part until the time came to settle it in the month of May, unless orders to the contrary were given in the meantime.

No money accompanied his order sent January 11 to purchase the wheat. Plaintiff made the purchase, informed him of that fact, and requested him to send his check, which he did. When he found, on January 28, by the market report, that his margins had been exhausted, he did not inquire of plaintiff whether it had closed out or sold out the deal, but assumed that plaintiff had not, and sent it an additional $150. As we shall hereinafter show, it must be presumed that defendant knew the course of dealing on the Chamber of Commerce.

It was conceded by defendant on the argument that plaintiff was personally responsible for all loss on this deal to the full extent of the fall in the market, and that, if it did not have on hand a sufficient deposit of defendant's money to cover the loss, it would have to pay the balance of such loss out of its own funds. It is plain that when defendant sent in the order on January 11 he expected plaintiff to make the deal, and thereby incur liability for loss, without first receiving any deposit at all from him, and it did so make it.

Again, after he had put up such a deposit, if, after his margin ran low, the market fell suddenly to a point where the loss would exceed the amount of the deposit, plaintiff might not have an opportunity to go upon the open board of the chamber, and sell out the deal after the amount of such deposit was exhausted, and be-

fore the market dropped below the point at which the deposit was exhausted, and thereby prevent loss to itself. Defendant knew all of this. On January 28 he promptly and voluntarily put up additional margins without being asked for them, when he found by the market reports that his margins were exhausted, and yet until April 7, when plaintiff demanded still more margin after the loss here in question had occurred, he failed to notify plaintiff that he would not pay anything more for carrying the deal.

2. Respondent contends that he employed plaintiff to act as his agent in purchasing wheat for him from some third party, and to carry and continue the contract in that form; that it appears by the evidence that a wholly different contract was made, whereby plaintiff was to become and did become the opposite party to a contract with him to sell him wheat for future delivery; that, while plaintiff was acting as his agent to buy, it attempted to become the opposite party to the contract, and sell to him wheat through itself as such agent. The contract made was of this peculiar kind, and respondent contends that it was so made without his knowledge or consent. We cannot so hold.

The Chamber of Commerce is a corporation. Its members meet daily in a certain room at a certain hour, and buy and sell large quantities of grain for both present and future delivery. No one but members are allowed these privileges. While in the great bulk of the transactions the members act as brokers or agents for others, the rules require them to buy and sell in their own names, without disclosing their principals; and this is the uniform custom. The contracts of purchase and sale are oral, and each member makes at the time a memorandum of the transaction on a card, and retains it for his own convenience. At the close of each day's transactions, it is usually found that each member has bought from and sold to various other members for future delivery, and a universal system of set-off is then resorted to.

There is another corporation, known as the Clearing Association, which acts as a universal go-between, or clearing house, for these transactions. At the close of each day's business, all of these transactions are reported to the Clearing Association, which then becomes the opposite party to the transactions of each member for

the purpose of offsetting the same. When the member is the buyer, the Clearing Association becomes the seller, and, when the member is the seller, the Clearing Association becomes the buyer. Then all of the transactions between that member and the clearing house are offset, and the balance carried in the account between them until the next day, when a new balance is struck.

But balancing new transactions is but a part of the business of the clearing house in regard to sales for future delivery. As the price goes up or down each day, the clearing house pays to the member or receives from him the difference in price on that day's balance; if, on balancing all transactions with him, it appears that he has bought more than he has sold, he is buyer as to such balance, and the clearing house is seller, and vice versa. If he is buyer as to such balance, and wheat fell in price that day, he must pay to the clearing house the difference between the price on that day and the price on the day before, and vice versa.

It will thus be seen that each member acts as a clearing house within himself as to all his customers, and that he offsets the transactions of his customers against each other, and only resorts to the Clearing Association for any balance of buyers over sellers or sellers over buyers among his own customers. Except as hereinafter stated, it does not appear by the evidence whether or not defendant knew that this was the customary way of doing business in the Chamber of Commerce.

When the order of January 11 was received from defendant by plaintiff, it went upon the open board, and purchased the wheat from A. G. Chambers & Co., another member of the chamber. This transaction passed through the clearing house, and was offset and carried along from day to day in the manner above described. Then it is clear that there was no opposite party to this transaction except plaintiff's own broker, this plaintiff, and that the latter, Chambers & Co., and the Clearing Association never intended that there should be any other. But was not this also defendant's intention? He contends not. He had been dealing in options for nearly two years, and had at least three prior deals in which plaintiff acted as his broker. In his letter of January 12 he spoke of the transaction as an "option." On January 28 he wrote that he

learned from the market report that his "margins" were exhausted. When plaintiff telegraphed him on April 7 for $400 more for margins, he answered:

"Your telegram of this morning is a surprise. I have been under the impression that, according to the general rules, you had closed my option when the margins were exhausted, as no notice to the contrary was received, and no demand for margins made, although the May price has been below 70 cents for some time; and I must decline to remit additional margins."

This would indicate that he was quite familiar with "margins" and "options," and that this class of transactions was governed by rules peculiar to the business. But whether he was thoroughly familiar with the way of conducting this business, and the rules pertaining to the same, is not material. He is bound by the custom of the business, whether he is familiar with those customs or not.

"It may be laid down as a general proposition that one who employs a broker to operate in stocks for him must be presumed to give him authority to act as other brokers do, and, in the execution of his orders, to follow the rules and usages of the stock exchange. And in the application of this rule it has been held that it is immaterial whether the principal is familiar with such rules and usages or not." 23 Am. & Eng. Enc. 733,

And the many cases cited.

"The usages of a particular place, or of a particular business, are impliedly incorporated into every contract of agency, unless the contrary is specially mentioned. The principal and agent are presumed to adopt such usages, and to agree to govern themselves in accordance with them. It is the duty of the principal to inform himself of such usages, and he cannot be allowed to say that he was ignorant of them." 27 Am. & Eng. Enc. 885, 886, and cases cited.

Respondent contends that he was not bound by the usages and customs of the Chamber of Commerce, and relies on Irwin v. Williar, 110 U. S. 499, 4 Sup. Ct. 160. In that case there was no clearing association, and in that respect the case differs from the one at bar. The effect of this difference we will discuss later.

The court, in Irwin v. Williar, relied on Robinson v. Mollett, L. R. 7 H. L. 802, which is still a different case. The tallow brokers

75 M.—20

of London had a custom whereby they would meet once a month on certain settling days, and each two brokers would balance between themselves the purchases and sales made by the one to or from the other. These brokers were not members of any general organization or corporation, and, so far as appears, were at liberty to buy from or sell to any person who called himself a broker, and perhaps to or from others who did not. The broker dealing with any of these parties was personally responsible for the acts of the party with whom he dealt, and might at any time suffer a loss by the failure of the latter. In Robinson v. Mollett that very thing occurred by the failure of Simpson & Co. In such a case the broker representing a principal was not a mere disinterested stakeholder, but a party adverse to the interest of his principal, and might at any time be called upon to make good to such principal a loss occurring by reason of the failure of the other broker or party with whom the deal was made.

In the opinion in Irwin v. Williar the court cited Robinson v. Mollett, L. R. 7 H. L. 802, to the effect that the principal is not bound by the custom of which he has no knowledge, where such custom, if allowed to prevail, would work a change in the relation between the broker and his principal by permitting the agent to buy, to convert himself into a principal to sell. In the former case the following extract is quoted from the opinion of Mr. Baron Cleasby in the latter case:

"Its vice [the vice of the custom or usage] consists, I apprehend, in this: that the broker is to make the contract of purchase for another whose interest as buyer it is to have the advantage of every turn of the market; but if the broker may eventually have to provide the goods as principal, then it becomes his interest, as seller, that the price which he is to receive should have been as much in favor of the seller as the state of the market would admit. Thus the two positions are opposed."

The facts were similar in the case of Baxter v. Sherman, 73 Minn. 434, 76 N. W. 211, and this court arrived at substantially the same result as was arrived at in the Robinson case.

In the case at bar the Clearing Association took from plaintiff the risk of the failure of the opposite broker, and also the risk of

being buyer for more than it was seller, or seller for more than it was buyer. Then plaintiff became a mere stakeholder for its own customers, so far as the sales and purchases of those customers balanced each other, and took no risk except as to the failure of its own customers to pay the amounts due from them; and against this risk plaintiff had a right to demand indemnity in advance. It would seem from the evidence that the Clearing Association took all other risks, and it is not suggested that the association was not amply responsible. Again, the risks taken by the Clearing Association were merely as to the responsibility of a previously ascertained and presumably well-known circle of brokers, limited in number. Then, if plaintiff ran its business strictly according to the rules and regulations, and compelled its customers to indemnify it in advance, it was not interested adversely to any of its customers. There is no evidence that plaintiff failed to live up to these rules, except as it failed to require or compel this plaintiff to indemnify it in advance.

The burden was on defendant to plead and prove that the transaction in question was illegal, or against public policy; and he has failed to maintain that burden. Then we are of the opinion that defendant was bound by the custom, whether he knew it or not.

3. Plaintiff foreclosed defendant's rights in his deal by selling it out on April 8 to another corporation, some of whose officers are also officers of plaintiff. The two corporations were separate entities, and the mere fact that some of the officers of one are officers of the other is not sufficient alone to avoid the sale. Defendant must show that some prejudice or injury resulted to him from the fact that the two corporations were thus related. 3 Thompson, Corp. § 4079.

This disposes of the case. The order appealed from is reversed, and judgment is ordered for plaintiff on the verdict.