## J. FRANK FRASER AND ANOTHER v. FARMERS CO-OPERATIVE COMPANY AND OTHERS.[1]

May 28, 1926.

No. 25,215.

**Guaranty of country elevator's debts—Hedging and gambling transactions.**

Action brought by a grain commission merchant against a corporation operating a country elevator and its guarantors to recover an alleged indebtedness arising out of transactions between plaintiff and the corporation. Defendants claimed illegal transactions in futures. Upon an examination of the record, *held*:

(1) Contract of guaranty construed as relating to future indebtedness only.

(2) Evidence of prior transactions was properly received only as bearing upon the legality of the later ones.

(3) That the evidence was such as to present a question for the jury to decide whether certain particular trades were hedges or gambling transactions.

(4) Failure of a grain commission merchant to furnish the statutory confirmation required by G. S. 1923, § 10491, makes a prima facie case of an illegal transaction. Banner Grain Co. v. Burr F. E. & S. Co. 162 Minn. 334, 202 N. W. 740, followed.

(5) The word "option" in ordinary parlance has no application to a hedge, but is understood to mean a speculative contract.

(6) Hedging is a legitimate transaction but no recovery can be had upon illegal transactions in futures.

(7) Misconduct of counsel as disclosed in the opinion is not sufficient to justify granting a new trial.

Appeal and Error, 4 C. J. p. 919 n. 34; p. 957 n. 67.
Evidence, 22 C. J. p. 751 n. 81.
Gaming, 27 C. J. p. 993 n. 37; p. 994 n. 42, 49; p. 1055 n. 44; p. 1060 n. 58 New; p. 1061 n. 64, 65 New; p. 1065 n. 96; p. 1104 n. 1 New; p. 1105 n. 11 New.
Guaranty, 28 C. J. p. 948 n. 91.

[1]Reported in 209 N. W. 33, 913.

Action in the district court for Nobles county. There was a verdict for the plaintiffs against the defendant elevator company only. The other defendants were the elevator company's guarantors. The plaintiffs appealed from an order, Gislason, J., denying their motion for judgment notwithstanding or a new trial. Affirmed.

*E. A. Nicholas* and *E. J. Jones,* for appellants.

*Wilson Borst* and *John F. Flynn,* for respondent.

WILSON, C. J.

Appeal from an order denying an alternative motion for judgment non obstante or a new trial.

Plaintiff, a copartnership, is a grain commission merchant. Defendant corporation owned and operated two small country grain elevators. Plaintiff had the usual business relation with it for several years. The individual defendants became its guarantors to plaintiff as of February 25, 1921.

Accounts were settled between plaintiff and the corporation up to July 1, 1920. The business relation terminated on August 31, 1921. Plaintiff sued for $6,882.12 on account, and of this amount $3,799.49 was incurred prior to February 25, 1921, and $3,082.63 accrued thereafter.

We construe the guaranty contract as relating to future indebtedness and not to existing obligations. The charge of the court submitting this element to the jury was too favorable to plaintiff. The matter with which we are mostly concerned is the counterclaim of defendant corporation arising out of alleged illegal transactions in connection with future trades. This is also pleaded as a defense by the individual defendants.

It does not seem to have been the theory of the defendant that the manager of the elevator used their credit or money to transact and carry on gambling transactions in the name of defendant corporation, with knowledge of plaintiff, but for his own individual speculation. Such was pleaded but the theory of the trial court did not follow the pleading which found little support in the evidence. The court submitted to the jury the question whether any of the in-

debtedness represented losses sustained in gambling transactions, disregarding the theory that the manager without the knowledge of defendants handled the trades as his own speculation. Defendants took no exceptions to the charge. So we are confronted with a situation wherein defendants assert the transactions between the corporation and plaintiff were illegal.

Evidence was received relative to a trade in corn had on April 10, 1920, and June 25, 1920. This was prior to a settlement had between plaintiff and the corporation on June 30, 1920. The parties thereto are concluded by the settlement but this evidence was admissible as bearing upon the inquiry as to whether the later transactions hereinafter mentioned were tainted with illegality. Jamieson v. Wallace, 167 Ill. 388, 47 N. E. 762, 59 Am. St. 302. Defendant corporation on April 10, 1920, sold 20,000 bushels July corn when it had but 1,482 bushels of corn. The transaction had no actual relation to any corn owned. This trade was closed on June 25, 1920. A loss of $3,136.40 resulted. On June 25, 1920, defendant sold 20,000 bushels September corn under circumstances justifying the conclusion that it was not a hedge. This trade was closed on July 12, 1920, by a purchase of 20,000 bushels September corn. On that date defendant corporation had 112 bushels of corn. The plaintiff failed to furnish the statutory confirmation hereinafter mentioned. The facts would support a finding of illegality but it is unavailing to defendant corporation because of the settlement. Plaintiff must prevail against it alone for the $3,799.49 and interest and to this extent the defendant corporation has no defense. This was the prior and existing indebtedness for which the guarantors are not liable under their contract.

The real controversy with which we are concerned is whether a certain trade in 20,000 bushels July oats was a hedge or a gambling transaction. If the former all the defendants would be liable to the plaintiff for the additional sum of $3,082.63. If the latter there is no additional liability. On October 8, 1920, negotiations were had resulting in the plaintiff buying for defendant corporation 20,000 bushels May oats. This trade was closed on April 15, 1921, after

some profits made and more losses suffered, resulting in a net loss of $5,299.95. On the same date the corporation through plaintiff bought 12,000 bushels July oats. On October 8, 1920, plaintiff wired the corporation of this purchase and confirmed by letter saying: "Inclose confirmation herewith. This is on phone instructions from our Mr. Flow." The confirmation was not produced on the trial but the testimony identifies it as the same in character and form as other confirmations in the record. Mr. Smith, one of the plaintiffs, testified that the order was given him over the phone by the manager of the corporation who stated that he "had shipped out stored oats" to the amount of 20,000 bushels and that they needed 20,000 bushels May oats as a hedge against the stored oats that they had shipped out. There seems to be no other evidence in the case to support the claim that the corporation on October 8, 1920, had any grain against which they could carry a hedge.

The record as to the situation on April 15, 1921, when this trade was reduced to 12,000 bushels is not satisfactory. There were about that time 1,365 bushels of oats in the elevator. There were storage tickets outstanding for 19,981 bu. 10 lbs. of oats. Of this amount 9,406 bu. 18 lbs. which was in transit was apparently the only grain against which a hedge could have been made and to which the trade of 12,000 bushels might relate. No explanation is made as to why the future trade should involve an excess of 3,500 bushels. One Schlimme who was in charge of the elevator on April 22, 1921, says that he let this particular trade stand and closed out another one that the manager pretended was a hedge. On April 15, 1921, the manager wrote plaintiff that he had no future trades except the 20,000 bushels May oats. The particular trade was closed in June. As bearing upon the legality of the transaction the record discloses that the manager of the corporation was not carrying all of the transactions in reference thereto on its books. This included the item of $5,299.95 loss and some other items. The fact that the journal and ledger in the account books were incomplete may be important as indicating a desire to conceal the existence or character of the transaction. Relative to another feature concerning which

the books were incomplete and the last answer of which may have some bearing on the plaintiff's books, the witness Schlimme testified:

"Q. And did you find that his account in his book checked with the dates of the Fraser-Smith account?

"A. No, sir.

"Q. Did you find as to these facts, these margins that has been testified to, did you find them in his account at all?

"A. No, sir.

"Q. Are they on the books there?

"A. No, sir.

"Q. Did you find these purchases that you have been testifying on here, did you find those on his books?

"A. No, sir.

"Q. How did you get at those things? Did you get them from Fraser-Smith?

"A. I worked them out from the Fraser-Smith Company's statement, together with the memorandums that the Fraser-Smith Company sent me.

"Q. That is the only way that you could get at it?

"A. Yes, sir.

"Q. You could not get it from his books?

"A. No, sir.

"Q. Have you examined the statement or ledger account of the Fraser-Smith Company?

"A. Yes, sir.

"Q. During 1920 and 1921?

"A. Yes, sir, the statement that was rendered to me. Yes, sir.

"Q. And does that check up as far as you know with the ledger that he has here in court?

"A. It does.

"Q. Well, did that ledger account contain a statement of the—complete statement of these future transactions?

"A. No, sir."

This witness had charge of the business for some time. He audited the books of the corporation but did not find any statements

of monthly accounts from the plaintiff. He did find some communications from plaintiff showing debits and credits in the way of margins but not disclosing what the transactions were.

G. S. 1923, § 10491, requires every commission merchant to furnish to every customer for whom he executes any order for the actual purchase or sale of grain for future delivery a written statement containing names of parties from whom such property was bought or to whom it shall have been sold, the time when, the place where and the price at which the same was either bought or sold, and it provides a failure to furnish such statement shall be prima facie evidence that such property was not sold or bought in a legitimate manner. This court has said that the failure to comply with the statute makes a prima facie case of an illegal transaction. Banner G. Co. v. Burr F. E. & S. Co. 162 Minn. 334, 202 N. W. 740. Plaintiff in this case failed to furnish the statutory statement relative to the sale or purchase of any of the corn or oats hereinbefore referred to.

We are of the opinion that the record is such as to support a finding of the jury that the transaction involving the future trades in oats was a gamble. There are some circumstances which would support the conclusion that the plaintiff knew this. The transaction was carried as an open trade from October 8, 1920, to April 15, 1921, during which period there was a loss of $24\frac{1}{2}$ cents per bushel. According to Mr. Smith's testimony hereinbefore mentioned, this trade was originally made on October 8 against stored oats that had been shipped out. Had such been the case returns would have been made on the stored oats so shipped out within a very few days and in the ordinary course of such business the future trade if a hedge would have been closed. Plaintiff necessarily knew this. Such delinquency should have put plaintiff upon inquiry. No explanation is offered in the record as to why this trade was not closed if it was in fact a hedge against shipped grain.[1] Plaintiff continued to carry this open trade for what may well be considered an unreasonably long period of time without asking for explanation or making an investigation ascertaining that the same was justified as a hedge. Indeed, as late as April 2, 1921, plaintiff wrote a letter to the corporation in which it is said:

[1]See explanation of language in opinion denying reargument, page 379.

"You are long 20,000 bushels of May oats with us which we understand is against stored oats that you have shipped out."

But no inquiry is made as to the disposition of the stored oats so shipped out. On November 27, 1920, plaintiff wrote a letter to the corporation saying:

"We enclose statement of your option trades as they stand on our books at the close tonight.

"We strongly advise you not to stay long any option which is not against stored grain, and to handle your business in a very conservative manner, as financial conditions are getting very stringent, and if any of your option trades are for customers accounts we want you to be fully protected on margins or instruct us to close out the trades."

On February 10 plaintiff wrote the corporation:

"We understood you were going to ship us 3 or 4 cars of grain to Milwaukee without drafts, proceeds to apply against margins which we have put up on your open option trades."

The language of the above letter of November 27 is peculiar. A hedge could not be made against stored grain until it was moved, i. e., until it was used by the corporation as its own. Hedging is price insurance and the corporation would have nothing to insure until it did that which made it liable for the stored grain. So long as it had the grain to meet the demand of the holder of the storage ticket it had no risk to insure against market price. If this trade was carried against stored grain actually in the elevator it was not a hedge. It would be a mere pretense and would have no more legal efficacy than if the corporation did not have any grain to support the trade as a hedge. You cannot name a transaction or trade a hedge when in substance it is not. What element of the corporation's business called for plaintiff's advice, "not to stay long any option which is not against stored grain, and to handle your business in a very conservative manner?" Hedging is the most conservative

method of operating such business. If the trades were hedges why this advice? If these trades were hedges plaintiff should not in these two letters have referred to them as "options." A contract of sale which contemplates an actual trade of grain at a future time is not an "option." The word "option" in ordinary parlance means a mere choice, right or privilege of buying or selling, whereas in a legitimate hedging contract the parties are bound by the terms thereof. Indeed options as used with reference to such transactions as here involved are usually settled by adjusting market values as the party having the option may elect. It is simply a method for speculating in differences in the market value of the subject of the transactions. We believe the term is well understood to mean a mere speculative contract in which the parties speculate in the rise and fall of prices. 6 Words & Phrases, 5001-2, and cases cited; 27 C. J. § 118, p. 993, § 273, p. 1062; David Dows, Jr. & Co. v. Glaspel, 4 N. Dak. 251, 60 N. W. 60. We are laboring under the impression that in the ordinary hedging contract as conducted through the Chamber of Commerce of Minneapolis men do not refer to hedging contracts as options.

The manager of the corporation on April 13, 1921, advised plaintiff:

"We have no futures except the 20,000 May oats we have with you and we have about 12,000 bu. oats at present not paid for out on storage tickets. So you can sell the May oats and would like to have you buy 12,000 bu. July oats to protect the stored oats. We are shipping out all the oats we have as fast as we get cars set up. We'll have another car out for you today."

Nothing was done however toward closing out the trade for the 12,000 bushels July oats though ample time went by in which all such oats would have been sold terminating the necessity for a hedge. On June 27, 1921, plaintiff wrote:

"We are carrying long on our books for account of your company 12,000 July oats and as these oats are liable to be delivered to us after the 1st of July, we would like to have your authority for changing them over to September in case you wish these hedges carried further."

Even up to this last date no inquiry had been made as to the disposition of the particular oats against which it is claimed this trade was made as a hedge. Such conduct may permit inferences unfavorable to plaintiff. Plaintiff knew that its entire transactions were handled by the manager alone.

Again in the letter of November 27 plaintiff says: "If any of your option trades are for customers accounts we want you to be fully protected on margins or instruct us to close out the trades." This is not consistent with the claim that the trade was against shipped stored grain. In fact it tends to show that plaintiff knew otherwise.

We conclude with some reluctance that the jury was permitted to find that the plaintiff knew or in the exercise of ordinary caution should have known that the party at the other end of the transaction was gambling.

Hedging is a legitimate transaction. Bolfing v. Schoener, 144 Minn. 425, 175 N. W. 901; Van Dusen-Harrington Co. v. Jungeblut, 75 Minn. 298, 77 N. W. 970, 74 Am. St. 463; Farmers Co-op. Exch. Co. v. Fidelity & D. Co. 149 Minn. 171, 182 N. W. 1008. But contracts in form for future delivery, not intended to represent actual transactions, but merely to pay and receive the difference between the agreed price and the market price at a future day, are in the nature of wagers on the future price of the commodity, and are void. Dun. Dig. § 10133. If the transactions here involved are thus illegal as claimed by the defendants there can be no recovery for those items arising subsequent to February 25, 1921. Bolfing v. Schoener, supra; Mohr v. Miesen, 47 Minn. 228, 49 N. W. 862; McCarthy v. Weare Com. Co. 87 Minn. 11, 91 N. W. 33; Askegaard v. Dalen, 93 Minn. 354, 101 N. W. 503.

We are of the opinion that the record presents sufficient evidence to take the case to the jury and its verdict in reference thereto must stand.

Appellant assigns as error misconduct of counsel said to arise out of the cross-examination of one of the plaintiffs, wherein counsel

in making inquiry as to when the witness saw the former manager of defendant corporation with whom the transactions here involved had been made, perhaps unnecessarily, put this question: "Q. Did you go to see him while he was in the penitentiary?" Objection to the question was sustained. Whereupon appellant's counsel entered a further objection on the ground that it was highly improper and prejudicial, and respondent's counsel retorted:

"It is not anything of the kind. We will show this up before we get through. You need not worry."

Appellant's counsel did not ask the court to admonish the jury or to instruct them to disregard the question and remarks. They of course were wholly uncalled for and nothing can be here said in their defense. They related however to the conduct of a third party and not to the plaintiff or any of its employes or witnesses. If it imputed anything it was that the former manager was in prison. Doubtless some of the jury in a rural community as a matter of common knowledge would know that the insinuation was true or untrue as the fact was. The trial court being in the atmosphere of the trial did not find it necessary on his own motion to admonish the jury against the offending conduct. It did not in the judgment of the trial court justify granting a new trial. Such matters must rest largely in the discretion of the trial court. We do not think that the substance thereof is of such nature or importance, in the absence of anything indicating prejudice therefrom, to order a third trial of this case.

The other assignments of error have had our consideration and we do not find any of them containing meritorious matter for discussion.

Affirmed.

QUINN, J.
I dissent.

On July 16, 1926, the following opinion was filed:

PER CURIAM.

Petition for reargument is denied.

We deem it proper to add however that in the opinion we did not express recognition of the fact that the elevator company may properly hedge when it sells stored grain and carry that hedge until the storage tickets are redeemed. Doubtless it should do this. We may have erroneously stressed the failure of plaintiffs to make inquiry as to the disposition of stored oats shipped out as well as their failure to ask for explanations or making an investigation to learn that the transaction was justified as a hedge. The language used by us in an unduly restricted sense related to the evidence and circumstances indicating that plaintiffs knew that the transaction was not a hedge and we are of the opinion that because of other things mentioned in the opinion our conclusion was correct and it will not be disturbed because of the error which we acknowledge.