WHORLEY, Appellant, *v.* PATTON–KJOSE COMPANY, INC., Respondent.

(No. 6,798.)

(Submitted September 15, 1931. Decided October 21, 1931.)

[5 Pac. (2d) 210.]

462

*Messrs. Hurd, Hall & McCabe* and *Mr. C. F. Morris,* for Appellant, submitted a brief; *Mr. George E. Hurd* argued the cause orally.

464

466

*Messrs. Cooper, Stephenson & Hoover* and *Messrs. Belden & DeKalb,* for Respondent, submitted a brief; *Mr. O. W. Belden* argued the cause orally.

MR. JUSTICE MATTHEWS delivered the opinion of the court.

Plaintiff has appealed from a judgment in favor of defendant entered in an action for specific performance and accounting.

The record discloses the following facts: In 1929 the defendant corporation was engaged in the grain business with offices at Great Falls, Spokane and Minneapolis; plaintiff, one of its buyers, had had considerable experience in operating elevators. In May defendant acquired an elevator at Chester, and in July agreed to sell it to plaintiff on terms; before the contract was drawn, J. E. Patton, president, was called to Minneapolis and thereupon wrote Whorley the terms of the agreement as "a temporary basis for you to open on." Briefly stated, the letter recites: "We turn you the elevator at cost price of $11,000 plus interest from May 1st with cost of insurance, * * * the plant is to be carried in our name under a purchase contract." The defendant was to

finance plaintiff's operations, handle all commission business, keep his books at the Great Falls office, allow him all profit on grain bought, and charge or credit interest on monthly balances, as such balances showed a debit or credit, and "when the elevator is paid for, the debt then will be transferred to your account."

Plaintiff took possession on July 29 and operated on the "temporary basis" until October 5, when a formal contract was executed; the contract differs in minor particulars from the agreement as stated by Patton. The defendant's officers, and particularly Patton, supervised plaintiff's operations closely, directed the conduct of the business and kept in daily communication with him, by letter or telephone, or both.

In April, 1930, plaintiff was called to the Great Falls office for consultation and from there went to Minneapolis to investigate defendant's operations on the wheat market, which action was resented by Patton, who, on May 1, withdrew further financial support and threatened receivership proceedings, whereupon the parties executed a written agreement under the terms of which plaintiff was given until May 5 to secure a third party who would take over defendant's obligations and contract, failing which he was to yield possession and release all interest in the premises, and defendant was to pay him the amount found due him after a complete audit of the accounts and a weighing up of the house, "in the manner provided in the agreement above referred to" (the contract for sale). By agreement, defendant placed a man in the elevator to look after its interests.

The firm with which plaintiff was negotiating refused to further consider taking over defendant's contract on investigation of the affairs of the elevator. Without securing plaintiff's consent, defendant had an audit of the books made on May 10, by J. H. Clark, public accountant, who acted regularly as its auditor. Plaintiff refused to recognize the audit or yield possession of the elevator, and on May 7 commenced this action.

The complaint alleges full performance by plaintiff of the original contract and refusal by defendant, after demand, to perform; that plaintiff's earnings exceeded the cost price of the elevator, but defendant, without the knowledge or consent and without authority from plaintiff, used these earnings in speculation and confessed to him that it thus lost his money and so much of its own that it was no longer able to finance him; that the agreement of May 1 was signed only because of the threats made by Patton, and was not performed by defendant in that a mere "pretended" audit of the accounts was made.

By answer, cross-complaint and reply, issue was joined.

Because of Whorley's inability to comply with the demand of holders of storage receipts, the Grain Marketing Division of the Department of Agriculture took possession on May 19, disposed of the grain on hand and settled with such holders. Plaintiff remained in possession of the elevator.

For the purposes of the trial, defendant relied upon the Clark audit, while plaintiff caused an audit to be made by T. F. Ferris, a public accountant, who, under direction of plaintiff's counsel, segregated from the account of grain "purchased and sold" all items reflecting transactions in "futures." The two audits do not differ except as to the matter of segregation; each shows a profit on the business of handling actual grain, in the sum of $15,980.93, but, by treating the deals in futures as chargeable to the account of "grain purchased and sold," the loss on the stock market wipes out the profit and leaves plaintiff indebted to defendant in the sum of $2,907.74. Plaintiff characterizes the segregated items as gambling transactions, while defendant contends that they were legitimate "hedges" for plaintiff's protection, taken with his knowledge and consent and under his express authorization.

The Chester elevator had a capacity of about 27,500 bushels, 5,000 of which was required for the transaction of business, leaving but 22,500 storage capacity. By the end of August plaintiff had issued storage tickets for more than 30,000

bushels, and by mid-September for approximately 50,000. Early in August defendant notified plaintiff that the situation as to storage was grave and that he should not accept wheat for storage beyond his known capacity. However, Patton then secured storage capacity out of the state and notified plaintiff that he had secured for him storage for 30,000 bushels at Grand Forks, North Dakota, and 15,000 bushels at Seattle. Early in September, under Patton's direction, plaintiff commenced shipping wheat to Grand Forks for storage, sending the bills of lading to defendant; in all, twenty-three cars of wheat were so shipped within a few days. None of it was placed in storage, but all was sold in Minneapolis.

Thereafter Patton notified plaintiff that he had secured for him storage for 30,000 bushels of grain in Seattle, in addition to the original 15,000 provided at that terminal. Under Patton's instructions plaintiff then shipped thirty-seven cars of grain to Spokane for diversion to and storage at Seattle; all of this wheat was taken at Spokane for the filling of defendant's contracts in the west.

All storage wheat out of the elevator having been sold, defendant made "purchases" of wheat for future delivery, or engaged in stock market transactions, as follows: September 24, 2,000 bushels; September 28, 1,000 bushels; October 28, 30,000 bushels, and December 3, 36,000 bushels; with the exception of the last, all these contracts were for December delivery, the last for May delivery. In each instance, as the time of delivery approached, defendant "sold" and then or thereafter purchased additional contracts for delivery at a more remote date, until it finally closed out the last of its "futures contracts" on May 19, or two days after this action was instituted. All of these transactions were entered on the books as "wheat purchased and sold" by Whorley.

There is no conflict in the evidence as to the facts heretofore stated. The disputed points are as to whether plaintiff had knowledge in advance of the proposed sale of stored wheat and consented to such sale and a substitution of stock market

contracts; whether he authorized the stock market transactions and as to the nature and legality of those transactions.

The trial court resolved all controversies in favor of defendant by its finding that "all of the said contracts for the purchases and sales of grain for future delivery were made as hedges or for the protection of plaintiff, with his knowledge and * * * consent and were authorized by him and were proper debit items against plaintiff's account * * * except one. There is due and owing from plaintiff to defendant * * * $2,907.74 * * * less (loss on transaction of March 6) * * * $1,580.72 * * * which was a gambling transaction, a 'flyer' in the market * * * which defendant will have to pay or stand the loss." This finding is challenged as not supported by the evidence.

As we indulge the presumption that findings are correct, we will assume that the phrase "or for the protection of plaintiff" is not merely explanatory of the term "hedges" but covers any legitimate transaction, thus giving the widest possible scope to the finding for its affirmance.

While counsel for defendant insist that all of the transactions were "hedges" and, on cross-examination of the witness Ferris, took exception to his designation of them as "options," defendant's officers, in letters to Whorley, referred to them as options, and even on the stand Patton several times made like reference, particularly when he said that, after the books showed a profit balance to plaintiff, "we gave him more latitude on his options and holding cash wheat."

The following comments found in *Fraser* v. *Farmers' Co-op. Co.*, 167 Minn. 369, 209 N. W. 33, are pertinent here: "If the trades were hedges plaintiff should not * * * have referred to them as 'options' * * * ." "We are laboring under the impression that in the ordinary hedging contract, as conducted through the chamber of commerce of Minneapolis, men do not refer to hedging contracts as options." The court then defined "options" and Patton's testimony as to the manner in which the transactions were handled bring them dangerously near to that definition.

However, "those who deal in futures on the market are divided into three classes: First, those who use them to 'hedge,' i. e., to ensure themselves against loss by unfavorable changes in prices at the time of actual delivery of what they have to sell or buy in their business; second, legitimate capitalists who, exercising their judgment as to the conditions, purchase or sell for future delivery with a view to profit based on the law of supply and demand; and third, gamblers and irresponsible speculators who buy and sell as upon the turn of the card." (*United States* v. *New York Exchange,* 263 U. S. 611, 68 L. Ed. 475, 44 Sup. Ct. Rep. 225.)

The term "option" means a choice, right or privilege of ▆ buying or selling, and where transactions involve merely the adjustment of market values at the election of the holder, they are "options," not "hedges," and are illegal and ° void. (*Fraser* v. *Farmers' Co-op. Co.,* above.) "In other words, contracts made for future delivery with the intention of settling them by paying to the other parties to the contracts the difference between the contract price and the market price at the time of delivery are wagers and are void." (*Cleage* v. *Laidley,* 149 Fed. 346, 352, 79 C. C. A. 284.)

Money loaned (or advanced) for speculation in grain cannot ▆ be recovered even though the lender did not expressly advise, abet or encourage the borrower in the commission of the illegal act. It is sufficient if the lender knew at the time the money was furnished that it was to be used for the purchase of "illegal options" (*Scott* v. *Baker,* 143 Ill. App. 151; *Gibney* v. *Olivette,* 196 Mass. 294, 82 N. E. 41), and partners to a gambling transaction cannot have an accounting in court as to the proceeds. (*Britt* v. *Davis Bros.,* 118 La. 597, 118 Am. St. Rep. 390, 43 South. 248.)

As plaintiff sought an accounting in the matter of a legitimate business and contended that the deals in futures were gambling transactions had aside from that business, while defendant also sought an accounting but insisted that the segregated items were properly chargeable therein, it would seem that, under the above rules, if plaintiff's characterization

of the deals is found correct, he should prevail even though it appears that he had full knowledge of the transactions and authorized them.

The court's finding as to, and exclusion of, the transaction of March 6 is in conformity with the rules stated.

As here used, the term "hedge" means "to safeguard one's self from loss on a bet or speculation by making compensatory arrangements on the other side" (Webster's New Int. Dictionary), and, concretely "it is a means by which collectors and exporters of grain and other products, and manufacturers who make contracts in advance for the sale of their goods, secure themselves against fluctuations of the market by counter-contracts for the purchase or sale, as the case may be, of an equal quantity of the product, or material of manufacture." (*Board of Trade* v. *Christie Grain & S. Co.*, 198 U. S. 236, 49 L. Ed. 1031, 25 Sup. Ct. Rep. 637.) It is the manufacturers' and merchants' insurance and, when properly employed, is no more damnatory than is insurance of property or life (*Board of Trade* v. *L. A. Kinsey Co.*, 130 Fed. 597, 69 L. R. A. 59, 64 C. C. A. 669; *State* v. *McGinnis*, 138 N. C. 724, 51 S. E. 50). For further discussion of legitimate hedging contracts, see *Browne* v. *Thorn*, 260 U. S. 137, 67 L. Ed. 171, 43 Sup. Ct. Rep. 36; *John Miller Co.* v. *Klovstad*, 14 N. D. 435, 105 N. W. 164; *Bolfing* v. *Schoener*, 144 Minn. 425, 175 N. W. 901. Such transactions are prima facie legal. (*Browne* v. *Thorn*, above.)

Country elevator hedging involves a purchase of grain and a sale of a future as simultaneously as possible, as insurance against the fluctuation of the market between the time of purchase and the arrival of the grain in Minneapolis for sale, and, on arrival, an equally simultaneous executing of the reverse of these transactions. It is a hedge only in so far as the transactions are simultaneous and the amount of grain sold for future delivery offsets the grain purchased. If the operator, having sold his actual grain, fails to buy back his hedge in the future market, he is backing his individual judgment

against the fluctuations of market prices and is speculating and no longer hedging.

The disputed transactions have little, if any, similarity to "hedging contracts," as defined by the authorities and summarized above. Assuming that the purchases were made as some sort of "protection" against disaster by reason of having sold stored wheat, they were not sales to compensate purchases but the reverse, which, under certain circumstances, might constitute legitimate hedges, but if so intended, except possibly, the purchases of September 24, September 28 and December 3, no purchases were made at the time of the sale of stored wheat or in quantity compensating such sales.

By the middle of October at the latest, defendant's testimony shows that it had sold approximately 30,000 bushels of stored wheat, but up to October 29 it had purchased for future delivery only 5,000; on the 30th it purchased 30,000 bushels and then held 3,000 bushels more than the total amount of wheat taken for storage, less the amount actually in the elevator. So long as the options or contracts were held, it might be said that they compensated sales of stored wheat, but in February defendant closed out all of its contracts and sold short 3,000 bushels; it then held no contracts for the protection of stored wheat sold. Thereafter defendant purchased wheat contracts for future delivery far in excess of all stored wheat sold. In no case did the "close out" bear any relation to demand for redelivery of stored wheat. No purchase was made because of danger of loss between the time of the actual purchase of wheat and time of delivery, as shown by plaintiff's testimony or that of the defendant's chief witness, Patton, on his direct examination.

It is clear that none of the transactions considered were ▮ hedges but, on the contrary, were speculations which, possibly to some extent, were carried on in the hope of "protecting" the parties liable against loss on account of the sales of stored wheat. It is said that this is a practice indulged in by some operators of country elevators. No such practice was proven respecting Montana operators and it would

seem that our laws were framed to render such a practice impossible. Here such an operator is a public warehouseman (sec. 3574, Rev. Codes 1921) and is required to accept for storage all grain in proper condition (sec. 3586, Id.), which requirement is reduced by the Department of Agriculture to seventy-five per cent, of his storage capacity. Delivery of grain for storage constitutes a bailment and the warehouseman must "at all times keep on hand in bonded warehouses grain of quantity and quality sufficient to settle all outstanding storage receipts," and must not sell or otherwise dispose of any of it, or deliver it out of storage, except to the owner or upon prior notice to the Department of Agriculture and after fully complying with the laws of the state and the regulations of the department. (See sec. 3588, Rev. Codes 1921, and Chap. 41, Laws of 1923, and Chap. 154, Laws of 1929.)

As the law requires the bailee "at all times to keep on hand in bonded warehouses" sufficient grain to make redelivery on all storage receipts, in complying with the law the most he could do would be to secure the permission of the Department of Agriculture to ship grain from his congested warehouse to bonded warehouses elsewhere. There is no room for a construction of our law which would permit the selling of stored wheat or speculation on the market with the farmer's wheat or the proceeds thereof. No attempt was made to comply with the law or the regulations of the department, the transactions were illegal and, even if compensatory and with the consent of plaintiff, as found by the court, it would seem that the parties were partners or joint adventurers in illegal transactions, and the rule so clearly announced in *McManus* v. *Fulton*, 85 Mont. 170, 67 A. L. R. 690, 278 Pac. 126, should apply.

It is, however, contended that defendant but acted as agent for plaintiff, but whether that theory would or would not aid defendant we need not now determine, as there are further considerations which render an affirmance of the judgment impossible.

In the first place, the only possible theory on which the losses could be charged to Whorley's account is, as found by the court, that they were on transactions authorized by him for his "protection" against the sale of stored wheat. No hedging contract for protection with respect to "cash wheat" could have been carried for Whorley's protection, for under the terms of the contract between these parties he but acted as agent for defendant in the purchase of wheat, paying its money therefor by check, which it honored, and taking title in its name; all commission business belonged to defendant, and the only extent to which departure was made from this provision was that, as a matter of bookkeeping and for the purpose of determining the price, defendant entered a "purchase" by Whorley at the time he notified them of the amount of cash wheat taken in and a "sale" to defendant immediately on determining the market price and "confirmation" notice to Whorley. Patton conceded that when Whorley made purchase of wheat from a farmer "it was our wheat." The theory of defendant throughout the trial was that defendant "protected" Whorley on his "stored wheat."

Now, while on direct Patton adhered to the theory of the defense, on cross examination he continually reverted to "Cash wheat," and when admonished that "we are dealing only with storage wheat," replied: "When it comes to long and short you have to take both sides into consideration"; asked to explain, he answered "cash and future," neither of which terms has anything to do with "storage wheat." Counsel then reminded him, "You just told us before recess all these open options were bought to protect storage grain," and he replied: "Not all of them, more to protect cash grain, * * * if I told you that I misunderstood." Thus the witness disproved the theory of his own defense and from his own testimony established that, if the transactions were intended as "hedges" on shipments from Chester to Minneapolis, "more" of them were for the protection of defendant than for the protection of plaintiff. Patton was the manager of defendant's business

and the only witness who presumed to speak for it on this subject.

Consequently, if the court's findings were otherwise fully supported by the evidence, we would be compelled to reverse the judgment and remand the cause for further testimony in order to determine which of the transactions, admittedly more than fifty per cent., were not chargeable to plaintiff's account. However, if the illegal transactions were chargeable to plaintiff's account on the theory of agency, this can only be by upholding the court's finding that they ''were made * * * with plaintiff's knowledge and * * * consent * * * and were authorized by him.''

Whorley's testimony is positive and emphatic to the effect that Patton practically controlled his operations and he merely obeyed orders; that, in the beginning, it was clearly understood that there should be no dealing in ''futures'' and that when available storage was exhausted he should refuse to accept further grain for storage; that sufficient storage was provided by Patton for all storage wheat he took in and the wheat was shipped for storage at Patton's direction, and that, when shipped and until he was notified after the sale of the wheat and the taking of the options, he fully believed the storage wheat for which he was responsible to the owners would be placed in bonded warehouses in compliance with the law. Plaintiff further testified that, when notified of the first of these transactions, he protested, and that Patton told him that the Grand Forks storage had been ''lost through a misunderstanding'' and assured him of like storage secured at Seattle in lieu thereof; that, finding his protest as to the sale of the two or three carloads first arriving was unavailing, he immediately sold the balance in transit and purchased a like amount of wheat to replace it, so that he presumed that ''at all times'' he had on hand the quantity of wheat for which he had issued storage tickets.

It is undisputed that plaintiff thereafter, under Patton's direction, shipped thirty-seven carloads of stored wheat to Spokane for storage in Seattle, to fill the 45,000 bushels stor-

age capacity Patton had secured for him at that point. Whorley testified that on December 3 he was called from the Great Falls office and notified by Patton: "You have approximately 38,000 bushels of cash wheat out here, what are you going to do with it?" "I said, 'do with it, haven't you put it in storage?' He said, 'No we haven't and we are going to sell the cash wheat and buy the option for you'; I said, 'I don't want it'; he said, 'It don't make any difference, you are going to take it.'"

The fact that twenty or twenty-one of the cars of wheat had been purchased by plaintiff, might justify Patton's designation of so much of the wheat as "cash wheat" (although Patton did not attempt to so justify his action in selling any part of the wheat) except for the fact that such wheat was not purchased with defendant's money, but with the proceeds of the sale of stored wheat and was but a substitution of a "like quantity and quality" as required by law. If all of the wheat arriving at Spokane was, as designated, "cash wheat," then it belonged to defendant and the purchase of "the option" for Whorley was identical with the transaction of March 6, condemned by the court and charged back to defendant.

Plaintiff testified in his case in chief that he never at any time authorized the sale of stored wheat or the purchase of wheat for future delivery, and that he was never notified or had knowledge of any such transactions until he received "confirmation slips" from the Minneapolis office, and on rebuttal denied all assertions to the contrary.

Defendant's correspondence, so far as it deals with subjects covered, corroborates plaintiff's statements and tends to refute those of Patton.

T. F. Lewis, called for plaintiff, testified that some time after November, 1929, Patton told him of the nice profit Whorley had made, and, when he remarked that it was a good thing there had been no losses, stated, "He couldn't have made a loss; we kept the books here in the office and we wouldn't let him make a loss."

As to the correspondence: J. V. Patton, son of J. E., in charge of the Minneapolis office, wrote Whorley in August, 1929, concerning the "serious situation" facing country elevators, by reason of the heavy carry-over from the year before, and advised him: "It looks to us as though you would have to decide how much storage you can let and not go beyond that point, for if you let your house fill up * * * there is noth-ing left but to lock it up." With the letter was inclosed a circular of advice, and the writer closed with "surely the place for the farmer to hold his grain this year is on the farm and I would emphasize this fact in whatever corespondence you put out." However, J. E. Patton notified Whorley that he had secured for him the 30,000-bushel capacity at Grand Forks early in August, and on the thirteenth wrote that, as a result of a conversation between the two on "Sunday," he was furnishing Whorley with 15,000-bushel capacity at Seattle for "permanent storage," stating, "we will throw these * * * and forget it until spring as I believe you are going to be crowded and there is no chance in the world to sell the wheat and take the hedge as there is a loss right at the start." The next day he wrote: "It looks like when all of the available storage is filled up, there is only one question to decide and that is to cut out storage entirely and handle only cash wheat." He again referred to the impos-sibility of hedging with reference to stored wheat and closed, "We are mighty glad that we have protected our customers as we have regarding storage, but we are not asking for any more as we do not know where we can get it." On August 26, J. E. Patton referred to the impossibility of profitably sell-ing stored wheat "and taking the option," and said, "We have agreed to take so many thousand from you and we have en-gaged this storage and in return we are to receive storage tickets; * * * this will protect you under your bond, * * * and you are fully within the law on the storage proposition; * * * I was successful in adding to our

already contracted storage and we feel very good we are able to assist you.''

Thus defendant declared against selling stored wheat and taking the ''hedge'' or ''option,'' admitted that it had ''agreed'' to take 45,000 bushels of wheat from plaintiff for storage; had secured the storage for it; declared it would place the wheat in storage and showed the manner in which it would handle the matter,—all corroborating plaintiff as to what was to be done by defendant in managing his business for him and for its protection on its ''financed accounts.''

Turning to Patton's testimony, we find many contradictions and inconsistencies within itself. Patton's version of the conversation antedating July 27, 1929, is: ''I told him that, in taking charge of the elevator there should be no speculative attitude toward the merchandising of grain and that all transactions in buying and selling should be properly hedged, * * * and we intended to supervise it very closely, us having all the money invested, * * * .'' As the agreement was thereafter made and the contract drawn, ''hedges'' on *''buying and selling''* transactions would be for defendant's protection as to grain belonging absolutely to it, and the statement does not in any manner detract from the force of Whorley's testimony on the subject; as to such transactions it was immaterial whether Whorley had knowledge, consented, or authorized the action of defendant.

To show authorization, Patton said, ''He would call us up and tell us he had bought five thousand * * * or one thousand bushels * * * and instruct us * * * to take the future against it.'' This statement is in direct contradiction to the witness' own explanation *as to how the business was transacted as to cash wheat and clearly* contrary to the facts.

Patton testified on direct examination that the Great Falls office kept close check on Whorley's account and, when it was found that he was not even on the market, ''we evened him up.'' On cross-examination he was questioned as to how this statement checked with his testimony that he acted on

Whorley's direction and his attention was called to the condition of the record showing that the account was seldom "even," particularly to the condition on February 6, when all purchases of futures and an additional 3,000 bushels had been sold. The witness stated that he did not think such was the fact; "it wasn't possible"; that he "didn't think so," until he was shown the record, when, without hesitation apparent in the record, he explained, "We found he was long in a number of bushels and we called him on the 'phone and also wrote him a letter * * * calling his attention that he was long on the market and wanted him to get even." Counsel stated: "I understand your direct testimony to be that you looked after his affairs and * * * evened him up," to which he replied, "We called his attention and by his consent we evened him up." But counsel urged, "You didn't say anything yesterday about his directing you to even him up," to which Patton replied, "I don't recall the full testimony yesterday."

In attempting to explain the failure to place the wheat shipped to Grand Forks in storage, the witness first said that he "offered" the storage to Whorley but Whorley refused to accept it, which is, of course, contrary to the facts as disclosed by his own letters. He next explained "in the first place we contracted storage for this account * * * in Grand Forks, and the market changed, where the market was better in the west * * * so we transferred his Grand Forks storage and told him we could get him storage on the coast, and he insisted that he didn't want any storage as long as the farmers were selling as freely as they were." Yet the witness did not deny that he directed Whorley to ship the stored wheat to Seattle, prior to the first of December. He closed his explanation with the statement that "there was never a time but that we had storage up until he *canceled* it * * * along in December." According to the witness, then, Whorley "refused" to accept storage when offered to him in August, said he did not need storage in October or November, yet shipped wheat for storage and then "cancelled"

his storage "along in December" after all stored wheat had been sold; although Whorley had refused to accept storage, Patton directed him to ship to Grand Forks for storage and gives as the reason why the wheat was not placed in storage that "the market changed."

Asked to explain his use of the term "speculative attitude" toward the market, he answered, "My meaning in that term is that he should not buy any cash wheat without selling the individual wheat * * * or protecting himself by selling a future; * * * quite often there is no immediate demand for the particular lot of cash wheat that he has bought and, while holding * * * he must be protected * * * by going into the futures." Q. "Every time you bought some wheat from Mr. Whorley you didn't pay any cash for it and then you bought a future against that which saved his interest, didn't you presumably? A. Yes, protected his interest." Clearly, this answer to a leading question is contrary to all of the facts respecting the manner in which the business, under Patton's direction, was conducted. Of course, defendant did not pay any money when it "purchased" wheat from Whorley, for the sufficient reason that he purchased the wheat from the farmers with defendant's money, issuing a check which it thereafter honored, which was done before the defendant knew of the transaction.

P. F. Brown, an employee in the Great Falls office, testified that he wrote Whorley on April 17, 1930, to the effect that he was about 8,500 bushels long, and asking if he wanted them to even him up, and on May 19, after suit commenced, defendant notified him that, as he had "no margin" up with them, they were closing out his account on 11,000 bushels of July wheat. Brown testified further that in the spring, perhaps in March, he notified Whorley by 'phone that he was 15,000 bushels long, but that Whorley stated he thought the market would go up and would hold on. Whorley, called for defendant, identified, and admitted receiving, confirmative slips and letters which accompanied them from Minneapolis. The letters begin, "Your order received"; "this will confirm";

"our Great Falls notified us," etc. They indicate orders from defendant for plaintiff, but are of little importance.

While an offer transmitted by letter may be accepted by failure to answer, or a question pertaining to affairs in which both parties are interested, may be presumed answered to the satisfaction of the writer in like manner, the mere fact that a person received a letter containing false statements of fact does not impose upon him an obligation to reply or to protest the falsity of the statement, and the omission to answer such a letter has no probative value as tending to show an admission of the matters stated, especially where the party failing to reply has taken a final position in the matter of dispute, or for some other reason the correspondence on the subject has ended because no advantage could be deemed likely to accrue from further correspondence. (22 C. J. 326; 3 Wigmore on Evidence, sec. 1073, note 3.) "A man cannot make evidence for himself by writing a letter containing a statement which he wishes to prove. He does not make the letter evidence by sending it to the party against whom he wishes to prove the fact. He no more can impose a duty to answer a charge than he can impose a duty to pay by sending goods. Therefore, a failure to answer such adverse assertions in the absence of further circumstances making an answer requisite or natural has no effect as an admission." (*A. B. Leach & Co.* v. *Pierson,* 275 U. S. 120, 55 A. L. R. 457, 72 L. Ed. 194, 48 Sup. Ct. Rep. 57.)

There is a conflict in the evidence as to whether or not plaintiff protested against the action of defendant, but under the circumstances shown it is of little moment whether he did so or not.

As defendant's witness, Whorley admitted sending a telegram to the Minneapolis office on February 19, "Sell five May wheat my account," but stated that the transaction was merely a method of disposing of cash wheat and that "they instructed me to send it."

A careful analysis of the evidence demonstrates that it strongly preponderates against the quoted findings if, indeed,

in the light of Patton's admission on cross-examination, it ██ presents any substantial evidence supporting such findings. The rule applicable here is that, on appeal in equity cases, this court must determine from the record whether or not the evidence preponderates against the decision of the trial court, irrespective of the rule that it will not disturb findings based on conflicting evidence, and must take cognizance of conflicts and contradictions in respondent's testimony, as he is not entitled to recover unless that portion of his testimony least favorable to his contention is of such a character as to authorize recovery for him. (*Ferguson* v. *Standley*, 89 Mont. 489, 300 Pac. 245.) The following comment found in *Escallier* v. *Great Northern Ry. Co.*, 46 Mont. 238, Ann. Cas. 1914B, 468, 127 Pac. 458, is applicable to Patton's testimony: "A witness who is desirous of telling the truth cannot have any uncertainty as to the version of the same story given by him at different times. On the whole, his story, as it is presented in the printed record, is so far impeached by its own inherent improbability, in view of other circumstances admitted or proven, that it suggests fabrication."

It is further contended, however, that the contract for sale was abrogated and plaintiff's rights surrendered by and under the written agreement of May 1, which the court found to have been executed without fraud, duress, menace, undue influence or mistake, and executed by compliance with its terms by both parties, declaring that the plaintiff surrendered, and defendant took possession of, the elevator on May 6 and a complete audit of the accounts was made by auditor Clark. The finding is contrary to the evidence, in that it is undisputed that plaintiff refused to surrender possession, and is in conflict with the court's later finding that defendant is entitled to the immediate possession of the elevator. Further, the Clark audit was not made until May 10, and it cannot be said that it was the complete audit contemplated by the agreement, coupled with the weighing up of the house. The agreement clearly contemplated a correct audit, showing the exact amount due to plaintiff from de-

fendant which defendant agreed to pay to plaintiff in consideration of the surrender of the elevator and cancellation of his rights under the contract of sale. As demonstrated above, the losses on defendant's transactions in the wheat market were not chargeable to plaintiff's account, but all of these were so charged in the Clark audit, which, by this method of computation, caused the audit to show, not a balance due plaintiff, as contemplated by the agreement and properly shown on the books, but a debit in excess of $2,000.

Here the defendant is asking specific performance of the "contract" of May 1, and for an accounting thereunder; whether or not the pleadings and proof would warrant the court in rescinding the contract by adjudication, under sections 8726 and 8730, Revised Codes of 1921, and the holding in *Campana* v. *Dobry*, 69 Mont. 240, 221 Pac. 540, we need not decide, for, on the accounting asked by defendant under the very contract on which it relies, the plaintiff is entitled to payment from defendant of an amount in excess of the total "debt" carried on the books as the purchase price of the elevator, and was so entitled for a considerable period prior to the execution of the contract of May 1.

It is, therefore, apparent that the agreement of May 1 was executed under a misapprehension or mistake which was either mutual or existed on the part of the plaintiff and was known, or should have been known, to the defendant who kept his books. The agreement was made on the assumption, and the representation by Patton, that Whorley was in default on his contract, when in truth and in fact it was the defendant that was in default.

By the terms of the original agreement between the parties, stated by Patton in his letter of July 27 as a "preliminary basis" for Whorley's action in taking over the elevator and commencing operations, and which Patton stated he then had given to defendant's attorney for incorporation in the formal contract, the defendant turned the elevator over to Whorley as his property, retaining merely the "title" until it was paid for, and charged plaintiff with the full purchase price, as his

"debt" to defendant, with provision for the payment of the "debt" and without even a provision for forfeiture. The formal contract departs from the original agreement only in that it provides that defendant "agrees to sell" and agrees to convey title when the purchase price is fully paid, and then provides for forfeiture in case of Whorley's default, but it is the common form of a contract for sale of real property. On the execution of the executory contract for sale the defendant parted with, and Whorley secured, the equitable title to the elevator (*Wandell* v. *Johnson,* 71 Mont. 73, 227 Pac. 58), and immediately on full payment as shown by a monthly balancing of the account, Whorley was entitled to a deed conveying the legal title under the provisions of the contract.

Equity regards that done which ought to be done (sec. 8758, Rev. Codes 1921; *Guerin* v. *Sunburst Oil & Gas Co.,* 68 Mont. 365, 218 Pac. 949; *Morton* v. *Union Central Life Ins. Co.,* 80 Mont. 593, 261 Pac. 278), and, consequently, in a court of equity it must be assumed that legal title vested in Whorley at the latest on March 31, 1930, when his profit balance exceeded the full purchase price of the elevator. Thereafter the defendant could no more defeat specific performance of the executed contract by securing the agreement of May 1, on a misrepresentation of the condition of Whorley's credit account, than it could re-enter and retake possession and declare all payments forfeited under the forfeiture clause of the contract. From March 31 on, defendant was but the involuntary trustee of the title for the benefit of plaintiff (secs. 7886 and 7887, Rev. Codes 1921), and its failure to convey title constitutes a breach of trust and it cannot be heard to say in a court of equity that it has evaded the consequences of its delinquency because, under the circumstances noted, it secured plaintiff's signature to the relinquishment of rights which had already become fixed, but of which he was kept in ignorance.

The judgment is reversed and the cause remanded to the district court of Cascade county with direction to enter a decree of specific performance in favor of plaintiff and in

accordance with the prayer of his complaint, and to determine from the accounting made, eliminating the losses on trade in the wheat market, the amount due plaintiff from defendant, and enter judgment for plaintiff for the balance due after deducting the full amount due on the purchase price of the elevator.

MR. CHIEF JUSTICE CALLAWAY and ASSOCIATE JUSTICES GALEN, FORD and ANGSTMAN concur.

Rehearing denied December 2, 1931.

